ELKINS, PRESIDENT, UNIVERSITY OF MARYLAND
*v.* MORENO ET AL.

No. 77–154.   Argued February 22, 1978—Decided April 19, 1978

648

BRENNAN, J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post,* p. 669.

*David H. Feldman,* Assistant Attorney General of Maryland, argued the cause for petitioner. With him on the briefs were *Francis B. Burch,* Attorney General, *George A. Nilson,* Deputy Attorney General, and *Robert A. Zarnoch,* Assistant Attorney General.

*Alfred L. Scanlan* argued the cause for respondents. With him on the brief was *James R. Bieke.*\*

---

\*A brief for the American Council on Education et al. as *amici curiae* urging reversal was filed by *Sheldon Elliot Steinbach* and by the Attorneys General of their respective States as follows: *Robert F. Stephens* of Kentucky, *Francis X. Bellotti* of Massachusetts, *Anthony F. Troy* of Virginia, *Avrum Gross* of Alaska, *Carl R. Ajello* of Connecticut, *Richard R. Wier, Jr.,* of Delaware, *Arthur K. Bolton* of Georgia, *Wayne L. Kidwell* of Idaho, *Theodore L. Sendak* of Indiana, *William J. Guste, Jr.,* of Louisiana, *Joseph E. Brennan* of Maine, *A. F. Summer* of Mississippi, *John D. Ashcroft* of Missouri, *Paul L. Douglas* of Nebraska, *Robert List* of Nevada, *David H. Souter* of New Hampshire, *William F. Hyland* of New Jersey, *Toney Anaya* of New Mexico, *Louis J. Lefkowitz* of New York, *Rufus L. Edmisten* of North Carolina, *Allen I. Olson* of North Dakota, *James A. Redden* of Oregon, *Daniel R. McLeod* of South Carolina, *William Janklow* of South Dakota, *Robert B. Hansen* of Utah, *M. Jerome Diamond* of Vermont, *Chauncey H. Browning, Jr.,* of West Virginia, and *V. Frank Mendicino* of Wyoming.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Respondents, representing a class of nonimmigrant alien residents of Maryland,[1] brought this action against the University of Maryland[2] and its President, petitioner Elkins, alleging that the University's failure to grant respondents "in-state" status for tuition purposes violated various federal laws,[3] the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and the Supremacy Clause. The District Court held for respondents on the ground that the University's procedures for determining in-state status violated principles established in *Vlandis* v. *Kline*, 412 U. S. 441 (1973), and the Court of Appeals affirmed. *Moreno* v. *University of Maryland*, 420 F. Supp. 541 (Md. 1976), affirmance order, 556 F. 2d 573 (CA4 1977). We granted certiorari to consider whether this decision was in conflict with *Weinberger* v. *Salfi*, 422 U. S. 749 (1975). 434 U. S. 888 (1977).

Because we find that the federal constitutional issues in this case cannot be resolved without deciding an important issue

---

[1] The class certified by the District Court differs from that alleged in the complaint. As certified, the class is defined as:

"All persons now residing in Maryland who are current students at the University of Maryland, or who chose not to apply to the University of Maryland because of the challenged policies but would now be interested in attending if given an opportunity to establish in-state status, or who are currently students in senior high schools in Maryland, and who

"(a) hold or are named within a visa under 8 U. S. C. § 1101 (a) (15) (G) (iv) or are financially dependent upon a person holding or named within such a visa." *Moreno* v. *University of Maryland*, 420 F. Supp. 541, 564 (Md. 1976).

[2] The University was dismissed from the suit on the authority of *Monroe* v. *Pape*, 365 U. S. 167 (1961). See 420 F. Supp., at 548–550.

[3] The complaint alleged that petitioner's conduct violated 42 U. S. C. §§ 1981, 1983, 2000a, 2000a–1, 2000a–3, 2000d. App. 3A. Jurisdiction was predicated on 28 U. S. C. §§ 1343 (3), 1343 (4). The District Court proceeded on the premise that 42 U. S. C. § 1983 and the cited sections of Title 28 gave jurisdiction and a cause of action. See 420 F. Supp., at 548. Neither of these rulings is now in dispute.

of Maryland law "as to which it appears . . . there is no controlling precedent in the Court of Appeals of [Maryland]," Md. Cts. & Jud. Proc. Code Ann. § 12–601 (1974), we first decide some preliminary issues of federal law and then certify the question of state law set out *infra*, at 668–669, to the Maryland Court of Appeals.

I

In 1973 the University of Maryland adopted a general policy statement with respect to "In-State Status for Admission, Tuition, and Charge-Differential Purposes." In relevant part, this statement provides:

"1. It is the policy of the University of Maryland to grant in-state status for admission, tuition and charge-differential purposes to United States citizens, and to immigrant aliens lawfully admitted for permanent residence in accordance with the laws of the United States, in the following cases:

"a. Where a student is financially dependent upon a parent, parents, or spouse domiciled in Maryland for at least six consecutive months prior to the last day available for registration for the forthcoming semester.

"b. Where a student is financially independent for at least the preceding twelve months, and provided the student has maintained his domicile in Maryland for at least six consecutive months immediately prior to the last day available for registration for the forthcoming semester." Brief for Petitioner 7.

The term "domicile" is defined as "a person's permanent place of abode; namely, there must be demonstrated an intention to live permanently or indefinitely in Maryland." *Id.*, at 8. The policy statement also sets out eight factors to be considered in determining domicile, of which one is whether a student, or the persons on whom he is dependent, pays "Maryland income tax on all earned income including all taxable income earned outside the State." *Id.*, at 9.

In addition to establishing criteria for conferring in-state status, the general policy statement establishes an administrative regime in which a person seeking in-state status initially files documentary information setting out the basis for his claim of domicile. See *id.*, at 8–9. If the claim is denied, the person seeking in-state status may appeal, first through a personal interview with a "campus classification officer," then to an "Intercampus Review Committee (IRC)," and finally to petitioner Elkins, as President of the University. See *id.*, at 9–10.

## II

In 1974, respondents Juan C. Moreno and Juan P. Otero applied for in-state status under the general policy statement. Each respondent was a student at the University of Maryland and each was dependent on a parent who held a "G–4 visa," that is, a nonimmigrant visa granted to "officers, or employees of . . . international organizations, and the members of their immediate families" pursuant to 8 U. S. C. § 1101.(a)(15)(G) (iv) (1976 ed.).[4] Initially, respondent Moreno was denied in-state status because "neither Mr. Manuel Moreno nor his son, Juan Carlos, are Maryland domiciliaries." Record 41. Respondent Otero was denied in-state status because he was

---

[4] "(15) The term 'immigrant' means every alien except an alien who is within one of the following classes of nonimmigrant aliens—

.  .  .  .  .

."(G) . . . (iv) officers, or employees of . . . international organizations [recognized under the International Organizations Immunities Act, 59 Stat. 669, 22 U. S. C. § 288 *et seq.*], and the members of their immediate families."

Respondents Moreno and Otero are dependents of employees of the Inter-American Development Bank. App. 6A, 7A. Respondent Hogg is the dependent of an employee of the International Bank for Reconstruction and Development. *Id.*, at 9A. The complaint states that respondent Moreno has resided in Maryland for 15 years, Otero for 10 years, and Hogg for 5 years. *Id.*, at 4A.

neither a United States citizen nor an alien admitted for permanent residence. *Id.*, at 80.

These respondents took a "consolidated appeal" to the IRC, which also denied them in-state status in a letter which stated:

> "The differential in tuition for in-state and out-of-state fees is based upon the principle that the State of Maryland should subsidize only those individuals who are subject to the full scope of Maryland tax liability. Such taxes support in part the University. The University of Maryland's present classification policies rest upon this principle of cost equalization. In examining the particulars of your case it is felt that neither you nor your parents are subject to the full range of Maryland taxes (e. g., income tax) and therefore the University must classify you as out-of-state with the consequential higher tuition rate.
>
> "You have raised the question of domicile. It is our opinion that a holder of a G–4 visa cannot acquire the requisite intent to reside permanently in Maryland, such intent being necessary to establish domicile." *Id.*, at 51, 86.

A final appeal was made to President Elkins, who advised Moreno and Otero as follows:

> "It is the policy of the University of Maryland to grant in-state status for admission, tuition and charge-differential purposes only to United States citizens and to immigrant aliens lawfully admitted for permanent residence. Furthermore, such individuals (or their parents) must display Maryland domicile. This classification policy reflects the desire to equalize, as far as possible, the cost of education between those who support the University of Maryland through payment of the full spectrum of Maryland taxes, and those who do not. In reviewing these cases, it does not appear that the parents pay Mary-

land income tax. It is my opinion, therefore, that the aforesaid purpose of the policy, as well as the clear language of the policy, requires the classification of Mr. Moreno and Mr. Otero as 'out-of-state.'

"The University's classification policy also distinguishes between domiciliaries and non-domiciliaries of Maryland. In this regard, it is my opinion, and the position of the University, that the terms and conditions of a G–4 nonimmigrant visa preclude establishing the requisite intent necessary for Maryland domicile. Thus, because Mr. Moreno and Mr. Otero are not domiciliaries of Maryland, and because of the underlying principle of cost equalization, I am denying the requests for reclassification." App. 12A.

Respondent Clare B. Hogg's experience was similar. Her application for in-state status was initially rejected because:

"[T]he policy for the determination of in-state status limits the ability to establish an in-state classification to United States citizens and immigrant aliens admitted to the United States for permanent residence. As the person upon whom you are dependent holds a G–4 visa, and as you hold a G–4 visa, in my judgment you are not eligible for an in-state classification.

"Also, the person upon whom you are dependent does not pay Maryland income tax on all earned income, including income earned outside the state. I feel this further weakens your request for reclassification as this is an important criteria [sic] in determination of domicile." Record 106.

However, the IRC stated on appeal:

"It is the opinion of the IRC that a holder of a nonimmigrant visa, including the G–4 visa you hold, cannot acquire the requisite intent to reside permanently in

Maryland, such intent being necessary to establish domicile." *Id.,* at 111.

No mention was made of failure to pay taxes or of respondents' nonimmigrant status. See *ibid.* Yet on final appeal to President Elkins, these reasons, as well as respondent Hogg's lack of domicile, were recited in a letter virtually identical to those sent respondents Moreno and Otero as grounds for denying in-state status. See App. 13A.

Unable to obtain in-state status through the University's administrative machinery, respondents filed a class action against the University and petitioner Elkins, seeking a declaration that the class should be granted in-state status and seeking permanently to enjoin the University from denying in-state status to any present or future class member on the ground that such class member or a parent on whom such class member might be financially dependent

"(a) is the holder of a G–4 visa; (b) pays no Maryland State income tax on a salary or wages from an international organization under the provisions of an international treaty to which the United States is a party; or (c) is not domiciled in the State of Maryland by reason of holding such a visa or paying no Maryland State income tax on such salary or wages under the provisions of such a treaty." *Id.,* at 11A.

The District Court, on cross-motions for summary judgment, limited the relief granted to a declaration and enforcing injunction restraining petitioner Elkins from denying respondents "the opportunity to establish 'in-state' status" solely because of an "irrebuttable presumption of non-domicile." 420 F. Supp., at 565. The court specifically refused to grant respondents in-state status, holding that the facts with respect to the respondents' fathers, on whom each respondent was dependent, were in dispute. *Id.,* at 564–565. Similarly, the court did not indicate whether the University could or could

not exclude respondents because their fathers paid no Maryland state income taxes.[5]

With respect to the "irrebuttable presumption" issue, the

---

[5] The District Court did not set out reasons for denying this relief. However, it must have believed that the University would not exclude respondents from in-state status solely for cost-equalization reasons if they otherwise qualified for Maryland domicile. If this was not the case, the District Court could not, as it did, see 420 F. Supp., at 560, have found it unnecessary to pass on respondents' argument that the Supremacy Clause prohibits the States from penalizing those who seek to avail themselves of tax exemptions granted by federal treaties. Moreover, an examination of the pleadings before the District Court strongly suggests that, notwithstanding the correspondence set out above, the University has disavowed any intention to exclude respondents from in-state status solely because they, or the persons on whom they are dependent, paid no state income taxes. Thus, the University unequivocally denied respondents' allegation that

"(b) students whose parents do not pay Maryland income taxes on income earned from an international organization under the provisions of an international treaty . . . may not be granted in-state status because of the 'principle of cost equalization' and because the University's 'policy reflects the desire to equalize, as far as possible, the cost of education between those who support the University of Maryland through payment of the full spectrum of Maryland taxes, and those who do not' . . . ." App. 5A (Complaint ¶ 13 (b)).

See App. 16A (Answer ¶ 13). The University similarly disavowed any intent to exclude respondents solely on the basis of failure to pay state income taxes in its responses to respondents' requests for admission. See Record 134 (¶ 2 (d)) (denying that tax exemption given some G-4 visa holders is "relevant to the determination made pursuant to the . . . University of Maryland policy"); id., at 135 (¶ 3 (d)) (same); id., at 139 (¶ 6 (d)) (same); id., at 136 (¶ 4 (d)) (denying the relevance for in-state tuition purposes of the fact that a person may pay Maryland state taxes on less than 50% of his earned income); id., at 141 (¶ 8 (d)) (same); id., at 142 (¶ 9 (d)) (same); id., at 140 (¶ 7 (d)) (denying the relevance for in-state tuition purposes of the fact that a person may pay Maryland state taxes on only ."unearned" income). Finally, the University admitted as fact that

"an 'immigrant student' who is financially dependent upon a parent who is an immigrant lawfully admitted for permanent residence . . . may be

District Court first held that, although each respondent had been allowed to submit a complete statement of facts supporting his or her claim of domicile to University authorities, there had been no individualized hearing because the University had a "predetermined conclusion concerning the domicile of a G–4 alien," *id.*, at 555, namely, that a G–4 could not have the requisite intent to establish domicile. It then ruled that aliens holding G–4 visas could *as a matter of Maryland common law* become Maryland domiciliaries so long as such aliens were legally capable of changing domicile as a matter of *federal* law. See *id.*, at 555–556. An examination of the Immigration and Nationality Act of 1952, 66 Stat. 163, as amended, 8 U. S. C. § 1101 *et seq.*, demonstrated that G–4 aliens, as distinguished from some other classes of aliens, had the legal capacity to change domicile as a matter of federal law. See 420 F. Supp., at 556–559. Accordingly, the University's irrebuttable presumption that G–4 aliens could not become Maryland domiciliaries was not universally true. Since "reasonable alternative means of making the crucial [domicile] determination," *Vlandis* v. *Kline*, 412 U. S., at 452, were readily at hand, the University's policy violated the Due Process Clause of the Fourteenth Amendment. See 420 F. Supp., at 559–560. These conclusions were affirmed by the Court of Appeals for the Fourth Circuit, which adopted the reasoning of the District Court. App. to Pet. for Cert. 54a–55a.

---

granted in-state status, whether or not the parent on whom such student is financially dependent currently pays Maryland income tax, provided that such parent can exhibit all of the other relevant domiciliary criteria . . . ." *Id.*, at 142.

Since no party has suggested a difference between immigrant and nonimmigrant aliens other than the possibility that the latter cannot become domiciliaries, the University's admission tends to confirm that the tax issue is not determinative of in-state status for any group of aliens.

For the reasons set out above, we, like the District Court, do not now decide whether the University would be barred by the Supremacy Clause from denying in-state status on tax grounds.

III

A

In this Court, petitioner argues that the University's in-state policy should have been tested under standards set out in *Weinberger* v. *Salfi,* 422 U. S. 749 (1975), and its progeny, since in petitioner's view these cases have effectively overruled *Vlandis.* As an alternative argument, petitioner asserts that the District Court should be reversed because its conclusions on points of Maryland and federal law were erroneous and in fact it is universally true that a G-4 visa holder cannot become a Maryland domiciliary.

Respondents reply that *Vlandis* was distinguished, not over-ruled, by *Salfi,* and, as distinguished, *Vlandis* covers this case. Moreover, they assert that the District Court correctly inter-preted federal and Maryland law. Because the University's policy would on this view discriminate against a class of aliens who could become Maryland domiciliaries, they also argue, as they did in the District Court,[6] that they should prevail on equal protection grounds even if they cannot prevail under *Vlandis.*[7] Cf. *Nyquist* v. *Mauclet,* 432 U. S. 1 (1977).

Although the parties argue this case in terms of due process, equal protection, and *Vlandis* versus *Salfi,* the gravamen of their dispute is unquestionably whether, as a matter of federal and Maryland law, G-4 aliens can form the intent necessary to allow them to become domiciliaries of Maryland. The University has consistently maintained throughout this litiga-tion that, notwithstanding other possible interpretations of

---

[6] The District Court did not pass on the equal protection argument. See 420 F. Supp., at 560.

[7] The respondents also argue that the University's policy is invalid under the Supremacy Clause since control over aliens and over foreign relations is vested exclusively in the Federal Government. We have no need to reach this argument at this time.

its policy statement, its "paramount" and controlling concern is with domicile as defined by the courts of Maryland.[8]  It has eschewed any interest in creating a classwide exclusion based

---

[8] Petitioner will be surprised to learn from the dissent, see *post,* at 672–676, that the University's treatment of respondents is not really determined by the Maryland common law of domicile and therefore that this case is governed by *Weinberger* v. *Salfi,* 422 U. S. 749 (1975), not *Vlandis* v. *Kline,* 412 U. S. 441 (1973).  For petitioner's view of the University's policy, contrary to that suggested by the dissent, has consistently been: "The Defendant University distinguishes between *domiciliaries* and *non-domiciliaries* of the State of Maryland . . . .  This represents a policy decision of the Board of Regents of the University, which has been implemented in the rules and guidelines of the Policy Statement . . . ."  Record 215 (emphasis added).  And again: "The wording of the 'In-State' policy is structured so as to initially deny 'in-state' status to non-immigrant aliens. This structure incorporates the determination that under the law and definition of *domicile as established and applied by Maryland courts,* non-immigrant aliens cannot display the intent to permanently reside within the State which is requisite to establishing Maryland domicile." *Id.,* at 217 (emphasis added).  And again: "[The University's] actions and policy *rest upon a definition, not a presumption.*  Defendants have denied Plaintiffs 'in-state' status based on an evaluation of their domicile under Maryland law: the existence of a G–4 visa is merely a single operative fact, *albeit paramount, which is placed in the context of what Defendants have determined to be the definition of domicile established by the Maryland courts." Id.,* at 231 (second emphasis added).  And again: "This distinction [between immigrant and nonimmigrant aliens] was based upon a reading of the Maryland law of domicile in conjunction with the terms and conditions of the non-immigrant visas described in 28 [*sic*] U. S. C. § 1101 (a) (15) (A) through (L), a determination thereby having been made that non-immigrants do not have the intent requisite for establishing Maryland domicile. . . .  That State University's [*sic*] can establish such . . . 'domicile' policies and make distinctions between domiciliaries and non-domiciliaries is well established . . . ." *Id.,* at 233.

Indeed, respondents argued below against abstention, see n. 15, *infra,* on the same grounds now argued by our Brother REHNQUIST against certification, namely: "[T]he Maryland common law of domicile is not at issue in this case.  No 'clarification' of the Maryland common law of domicile is needed.  Such common law principles, standing alone, do not set the tuition charged by the University of Maryland."  Record 272.  And peti-

solely on nonimmigrant status [9] or, apparently, on the fact that many G-4 aliens receive earned income that is exempt from Maryland taxation.[10] Because petitioner makes domicile the "paramount" policy consideration and because respondents' contention is that they can be domiciled in Maryland but are conclusively presumed to be unable to do so, this case is squarely within *Vlandis* as limited by *Salfi* to those situations in which a State "purport[s] to be concerned with [domicile, but] at the same time den[ies] to one seeking to meet its test of [domicile] the opportunity to show factors clearly bearing on that issue." *Weinberger* v. *Salfi*, 422 U. S., at 771.[11]

If we are to reverse the courts below, therefore, we must overrule or further limit *Vlandis* as, of course, petitioner has asked us to do. Before embarking on a review of the consti-

---

tioner countered: "What [respondents] apparently fail to understand is that the [University's] 'In-State Policy' is structured upon and reflects [the University's] understanding of the Maryland common law of domicile." *Id.*, at 340.

[9] There can be no doubt that, notwithstanding the policy statement's express reservation of in-state status to United States citizens and immigrant aliens, see *supra*, at 651, the University has no policy of excluding nonimmigrant aliens simply because they lack immigrant status under federal law. Petitioner's answer unequivocally states that the University has not "denied" nor does it "continu[e] to deny in-state status to all students who neither are United States citizens nor hold immigrant visas," App. 16A, although such an across-the-board denial would be required by the University's policy if it placed independent significance on immigrant status. Moreover, petitioner tells us that "the fact of alienage is completely irrelevant in itself to the issues controlling a determination of domicile." Record 232.

[10] See n. 5, *supra*. Indeed, although the dissent suggests that petitioner might bar respondents on cost-equalization grounds, see *post*, at 672–673, it is clear that petitioner has not done this although nothing in the District Court's injunction prohibits petitioner from doing so. See *supra*, at 655–656, and n. 5.

[11] In fact, the University allows evidence to be submitted bearing on respondents' claims of domicile—it simply does not evaluate that evidence.

tutional principles underlying *Vlandis,* however, proper concern for *stare decisis* joins with our longstanding policy of avoiding unnecessary constitutional decisions to counsel that a decision on the continuing vitality of *Vlandis* be avoided unless it is really necessary. See, *e. g., Bellotti* v. *Baird,* 428 U. S. 132, 146–151 (1976); *Reetz* v. *Bozanich,* 397 U. S. 82 (1970); *Harman* v. *Forssenius,* 380 U. S. 528, 534 (1965); *Harrison* v. *NAACP,* 360 U. S. 167, 177 (1959); *Railroad Comm'n* v. *Pullman Co.,* 312 U. S. 496 (1941); cf. *Ashwander* v. *TVA,* 297 U. S. 288, 346–347 (1936) (Brandeis, J., concurring). So far, no such showing of necessity has been made out:[12] If G–4 aliens cannot become domiciliaries, then respondents have no due process claim under either *Vlandis* or *Salfi* for any "irrebuttable presumption" would be universally true. On the other hand, the University apparently has no interest in continuing to deny in-state status to G–4 aliens as a class if they can become Maryland domiciliaries since it has indicated both here and in the District Court that it would redraft its policy "to accommodate" G–4 aliens were the Maryland courts to hold that G–4 aliens can have the requisite intent.[13]

---

[12] Moreover, respondents' equal protection claim turns on whether it is in fact true that G–4 aliens can become domiciliaries of Maryland. If they cannot, the constitutional issues that would be raised are materially different from those briefed or argued here. For this reason, we also think certification proper. See, *e. g., Bellotti* v. *Baird,* 428 U. S. 132, 146–151 (1976).

[13] "The core of Plaintiffs' cause of action is their belief that under Maryland law a G–4 non-immigrant alien can be domiciled in this State. A judicial determination in the negative would foreclose their Constitutional and statutory arguments; *a determination in the affirmative would require the University's Board of Regents to rewrite the In-State policy to accommodate this category of domiciliaries.*" Record 239–240 (emphasis added).

Similar sentiments are expressed in petitioner's brief in this Court. See Brief, at 11, 12, 28, 30, 34, and 35 n. 20. And petitioner's counsel stated at oral argument that if the Court of Appeals of Maryland determined that a person with a G–4 visa is capable of forming the requisite intent to

Accordingly, the question whether G–4 aliens have the capacity to acquire Maryland domicile is potentially dispositive of this case. Since the resolution of this question turns on federal statutory law and Maryland common law as to each of which there are no controlling precedents,[14] we first set out the correct meaning of federal law in this area and then *sua sponte* certify[15] this case to the Court of Appeals of Maryland in order to clarify state-law aspects of the domicile question.[16]

---

establish domicile, "the odds are reasonably high that the case would become moot because the university would change its policy, but that judgment is one that would be made by the regents . . . ." Tr. of Oral Arg. 14–15.

[14] No recent Maryland case has been cited in the briefs either here or below. In addition, petitioner's counsel, an Assistant Attorney General of Maryland, stated at oral argument that there "are no Maryland decisions one way or the other." *Id.*, at 10.

[15] Although petitioner asked the District Court to abstain, Record 211, he did not ask that court to certify the state-law question of domicile to the Maryland Court of Appeals. We need not decide whether the District Court's failure to abstain was erroneous, for, as we noted in *Bellotti* v. *Baird, supra*, at 150–151:

"This Court often has remarked that the equitable practice of abstention is limited by considerations of ' "the delay and expense to which application of the abstention doctrine inevitably gives rise." ' . . . As we have also noted, however, the availability of an adequate certification procedure 'does, of course, in the long run save time, energy, and resources and helps build a cooperative judicial federalism.' . . .

". . . [T]he availability of certification greatly simplifies [*Pullman* abstention] analysis." (Footnotes omitted.)

[16] Although it is our frequent practice to defer to a construction of state law made by a district court and affirmed by a court of appeals whose jurisdiction includes the State whose law is construed, see, *e. g.*, *Bishop* v. *Wood*, 426 U. S. 341, 345–346, and 346–347, n. 10 (1976) (collecting cases), we do not do so here for two reasons. First, the question of who can become a domiciliary of a State is one in which state governments have the highest interest. Many issues of state law may turn on the definition of domicile: for example, who may vote; who may hold public office; who may obtain a divorce; who must pay the full spectrum of state taxes. In short, the definition of domicile determines who is a full-fledged

B

Petitioner has argued, and respondents do not appear to disagree, that, if as a matter of federal law a nonimmigrant alien is required to maintain a permanent residence abroad or must state that he will leave the United States at a certain future date, then such an alien's subjective intent to reside permanently or indefinitely in a State would not create the sort of intent needed to acquire domicile. It is not clear whether this argument is based on an understanding of the common law of Maryland defining intent or whether it is based on an argument that federal law creates a "legal disability," see Restatement (Second) of Conflict of Laws § 15 (1) (1971), which States are bound to recognize under the Supremacy Clause. See *Nyquist* v. *Mauclet,* 432 U. S., at 4; *id.,* at 20 n. 3 (REHNQUIST, J., dissenting); *Seren* v. *Douglas,* 30 Colo. App. 110, 114–115, 489 P. 2d 601, 603 (1971) (semble); *Gosschalk* v. *Gosschalk,* 48 N. J. Super. 566, 574–575, 138 A. 2d 774, 779 (semble), aff'd, 28 N. J. 73, 145 A. 2d 327 (1958); *Gosschalk* v. *Gosschalk,* 28 N. J. 73, 75–82, 145 A. 2d 327, 328–331 (1958) (dissenting opinion). But cf. *Williams* v. *Williams,* 328 F. Supp. 1380, 1383 (V. I. 1971). In any case, we need not decide the effect of a federal law restricting nonimmigrant aliens

member of the polity of a State, subject to the full power of its laws and participating (except, of course, with respect to aliens) fully in its governance. Second, the status of the many foreign nationals living in Maryland is of great importance to Maryland because it potentially affects Maryland's relations with the Federal Government, other state and local governments in the greater District of Columbia area, and foreign nations. In a federal system, it is obviously desirable that questions of law which, like domicile, are both intensely local and immensely important to a wide spectrum of state government activities be decided in the first instance by state courts. This may not always be possible nor is it always required, but where as here there is an efficient method for obtaining a ruling from the highest court of a State we do not hesitate to avail ourselves of it. In so doing, we emphasize that we do not in any way suggest that the District Court's determination of Maryland law was incorrect.

postulated above, since it is clear that Congress did not require G–4 aliens to maintain a permanent residence abroad or to pledge to leave the United States at a date certain.

After extensive study, Congress passed the Immigration and Nationality Act of 1952, 66 Stat. 163, as amended, 8 U. S. C. § 1101 *et seq.* (1976 ed.), as a comprehensive and complete code covering all aspects of admission of aliens to this country, whether for business or pleasure, or as immigrants seeking to become permanent residents. See H. R. Rep. No. 1365, 82d Cong., 2d Sess., 27 (1952); S. Rep. No. 1137, 82d Cong., 2d Sess., 1–2 (1952). As amended in 1976, the Act establishes two immigration quotas, one for the Eastern and one for the Western Hemisphere.[17] The object of the quotas is to limit the number of aliens who can be admitted to the United States for permanent residence. To this end, the Act divides aliens into two classes. The first class, immigrant aliens, includes every alien who does not fall into an exclusion established by § 101 (a)(15) of the Act, 66 Stat. 167, as amended, 8 U. S. C. § 1101 (a)(15) (1976 ed.). Except for immigrant aliens who are "immediate relatives of United States citizens" or "special immigrants defined in section 101 (a)(27)," [18] each alien admitted for permanent residence or who later becomes eligible for permanent residence is chargeable against a quota and no alien can be granted permanent residence status unless a quota allocation is available.[19] However, it is important to note that there is no requirement in the Act that an immigrant alien have an intent to stay permanently in the United States.

The second class of aliens, nonimmigrant aliens, is established by § 101 (a)(15) of the Act. This section creates 12 subcategories of aliens who may come to the United States without need for a quota allocation. See §§ 101 (a)(15)(A)–(L).

---

[17] Immigration and Nationality Act Amendments of 1976, § 2, 90 Stat. 2703, amending § 201 of the 1952 Act, as amended, 8 U. S. C. § 1151 (1976 ed.).

[18] § 201 of the 1952 Act, as amended, 8 U. S. C. § 1151 (1976 ed.).

[19] 8 U. S. C. § 1151 (1976 ed.).

Congress defined nonimmigrant classes to provide for the needs of international diplomacy, tourism, and commerce, each of which requires that aliens be admitted to the United States from time to time and all of which would be hampered if every alien entering the United States were subject to a quota and to the more strict entry conditions placed on immigrant aliens.[20]

Although nonimmigrant aliens can generally be viewed as temporary visitors to the United States, the nonimmigrant classification is by no means homogeneous with respect to the terms on which a nonimmigrant enters the United States. For example, Congress expressly conditioned admission for some purposes on an intent not to abandon a foreign residence or, by implication, on an intent not to seek domicile in the United States. Thus, the 1952 Act defines a visitor to the United States as "an alien . . . having a residence in a foreign country which he has no intention of abandoning" and who is coming to the United States for business or pleasure. § 101 (a)(15)(B). Similarly, a nonimmigrant student is defined as "an alien having a residence in a foreign country which he has no intention of abandoning . . . and who seeks to enter the United States temporarily and solely for the purpose of pursuing . . . a course of study . . . ." § 101 (a)(15)(F). See also § 101 (a)(15)(C) (aliens in "immediate and continuous transit"); § 101 (a)(15)(D) (vessel crewman "who intends to land temporarily"); § 101 (a)(15)(H) (temporary worker having residence in foreign country "which he has no intention of abandoning").

By including restrictions on intent in the definition of some nonimmigrant classes, Congress must have meant aliens to be barred from these classes if their real purpose in coming to the United States was to immigrate permanently. Moreover,

---

[20] See S. Rep. No. 1137, 82d Cong., 2d Sess., pt. 1, p. 13 (1952); H. R. Rep. No. 1365, 82d Cong., 2d Sess., 52 (1952); H. R. Rep. No. 91–851, pp. 5–7 (1970).

since a nonimmigrant alien who does not maintain the conditions attached to his status can be deported, see § 241 (a) (9) of the 1952 Act, 66 Stat. 206, 8 U. S. C. § 1251 (a) (9) (1976 ed.), it is also clear that Congress intended that, in the absence of an adjustment of status (discussed below), nonimmigrants in restricted classes who sought to establish domicile would be deported.

But Congress did *not* restrict every nonimmigrant class. In particular, no restrictions on a nonimmigrant's intent were placed on aliens admitted under § 101 (a) (15) (G) (iv).[21] Since the 1952 Act was intended to be a comprehensive and complete code, the conclusion is therefore inescapable that, where as with the G-4 class Congress did not impose restrictions on intent, this was deliberate. Congress' silence is therefore pregnant, and we read it to mean that Congress, while anticipating that permanent immigration would normally occur through immigrant channels, was willing to allow nonrestricted nonimmigrant aliens to adopt the United States as their domicile. Congress' intent is confirmed by the regulations of the Immigration and Naturalization Service, which provide that G-4 aliens are admitted for an indefinite period— so long as they are recognized by the Secretary of State to be employees or officers (or immediate family members of such employees or officers) of an international treaty organization. See 8 CFR § 214.2 (g) (1977); 1 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 2.13b, p. 2–101 (rev. ed. 1977). Whether such an adoption would confer domicile in a State would, of course, be a question to be decided by the State.

Under present law, therefore, were a G-4 alien to develop a subjective intent to stay indefinitely in the United States, he would be able to do so without violating either the 1952 Act, the Service's regulations, or the terms of his visa. Of course, should a G-4 alien terminate his employment with an international treaty organization, both he and his family would lose

---

[21] See n. 4, *supra.*

their G–4 status. *Ibid.* Nonetheless, such an alien would not necessarily be subject to deportation nor would he have to leave and re-enter the country in order to become an immigrant.

Beginning with the 1952 Act, Congress created a mechanism, "adjustment of status," through which an alien already in the United States could apply for permanent residence status. See § 245 of the 1952 Act, 66 Stat. 217, as amended, 8 U. S. C. § 1255 (1976 ed.).[22] Prior to that time, aliens in the United States who were not immigrants had to leave the country and apply for an immigrant visa at a consulate abroad. See 2 Gordon & Rosenfield, *supra,* at § 7.7. Although adjustment of status is a matter of grace, not right, the most recent binding decision[23] of the Board of Immigration Appeals states:

> "Where adverse factors are present in a given application, it may be necessary for the applicant to offset these by a showing of unusual or even outstanding equities. Generally, favorable factors such as family ties, hardship, length of residence in the United States, *etc.,* will be considered as countervailing factors meriting favorable exercise of administrative discretion. *In the absence of adverse factors, adjustment will ordinarily be granted,* still as a matter of discretion." *Matter of Arai,* 13 I. & N. Dec. 494, 496 (1970) (emphasis added), modifying *Matter of Ortiz-Prieto,* 11 I. & N. Dec. 317 (BIA 1965).

---

[22] Until the Immigration and Nationality Act Amendments of 1976, n. 17, *supra,* nonimmigrant aliens whose country of origin was in the Western Hemisphere were excluded from adjustment of status. Section 6 of the 1976 Amendments, 90 Stat. 2705, removed this restriction. See 8 U. S. C. § 1255 (1976 ed.).

[23] Opinions of the Attorney General, the Board of Immigration Appeals, and of Immigration and Naturalization Service officers published in Administrative Decisions Under Immigration and Nationality Laws of the United States are "binding on all officers and employees of the Service in the administration of the [1952] Act." 8 CFR §§ 3.1 (g), 103.3 (e), and 103.9 (a) (1977).

The adverse factors referred to by the Board include such things as entering the United States under fraudulent circumstances[24] or committing crimes while in the United States.[25] There is no indication that any named respondent is subject to any such adverse factor, and, given each named respondent's alleged length of residence in the United States,[26] it would appear that any respondent could adjust his or her status to that of a permanent resident without difficulty.[27]

## C

For the reasons stated above, the question whether G–4 aliens can become domiciliaries of Maryland is potentially dispositive of this case and is purely a matter of state law. Therefore, pursuant to Subtit. 6 of Tit. 12 of the Md. Cts. & Jud. Proc. Code,[28] the following question is certified to the Court of Appeals of Maryland:

"Are persons residing in Maryland who hold or are named

---

[24] See, e. g., *Matter of Rubio-Vargas*, 11 I. & N. Dec. 167 (BIA 1965); *Matter of Vega*, 11 I. & N. Dec. 337 (BIA 1965); *Matter of Diaz-Villamil*, 10 I. & N. Dec. 494 (BIA 1964); *Ameeriar* v. *INS*, 438 F. 2d 1028 (CA3), cert. dismissed, 404 U. S. 801 (1971). See also *Matter of Barrios*, 10 I. & N. Dec. 172 (BIA 1963); *Brownell* v. *Carija*, 102 U. S. App. D. C. 379, 254 F. 2d 78 (1957); *Brownell* v. *Gutnayer*, 94 U. S. App. D. C. 90, 212 F. 2d 462 (1954).

[25] See, e. g., *Matter of Marchena*, 12 I. & N. Dec. 355 (Regional Comm'r 1967); *Matter of F——*, 8 I. & N. Dec. 65 (Asst. Comm'r 1958). See generally Annot., 4 ALR Fed. 557 (1970).

[26] See n. 4, *supra*.

[27] Cf. *Matter of Penaherrera*, 13 I. & N. Dec. 334 (Dist. Director 1969). Although this is a class action, see n. 1, *supra*, there is no reason on the present record to believe that G–4 aliens as a class are less qualified for adjustment of status than are the class representatives.

[28] "§ 12–601. Jurisdiction granted to Court of Appeals.

"The Court of Appeals may answer questions of law certified to it by the Supreme Court of the United States . . . when requested by the certifying court if there is involved in any proceeding before the certifying court a question of law of this state which may be determinative of the

in a visa under 8 U. S. C. § 1101 (a)(15)(G)(iv) (1976 ed.), or who are financially dependent upon a person holding or named in such a visa, incapable as a matter of state law of becoming domiciliaries of Maryland?" [29]

*So ordered.**

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

The University of Maryland, like all state universities, differentiates in tuition between "in-state" and "out-of-state" students. The two categories of students are delineated in the University's general policy statement on "In-State Status for Admission, Tuition, and Charge-Differential Purposes." Part 1 of the policy statement provides:

"It is the policy of the University of Maryland to grant in-state status for admission, tuition and charge-differential purposes *to United States citizens, and to immigrant*

---

cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the Court of Appeals of this state."

"§ 12–602. Invocation of subtitle.

"This subtitle may be invoked by an order of any court referred to in § 12–601 upon the court's own motion or upon the motion of any party to the cause."

"§ 12–603. Certification order.

"(a) *Form.*—A certification order shall set forth:

"(1) The question of law to be answered; and

"(2) A statement of all facts relevant to the question certified showing fully the nature of the controversy in which the question arose."

[29] The majority rule appears to be that within a single State "the rules of domicil are the same for all purposes." Restatement (Second) of Conflict of Laws, § 11, Comment *o*, p. 47 (1971). Should Maryland not follow this rule, we presume that the Court of Appeals will direct its attention to domicile for the purposes of this case.

*[REPORTER'S NOTE: Subsequently, the Maryland Court of Appeals answered the certified question, and a supplemental decision was rendered in *Toll* v. *Moreno*, 441 U. S. 458 (1979).]

*aliens lawfully admitted for permanent residence in ac-*
*cordance with the laws of the United States, in the*
*following cases:*

"a. Where a student is financially dependent upon a parent, parents, or spouse domiciled in Maryland for at least six consecutive months prior to the last day available for registration for the forthcoming semester[, or]

"b. Where a student is financially independent for at least the preceding twelve months, and provided the student has maintained his domicile in Maryland for at least six consecutive months immediately prior to the last day available for registration for the forthcoming semester." Brief for Petitioner 7 (emphasis added).

As is clear from the policy statement, domicile is not the sole criterion upon which the University of Maryland determines "in-state" tuition status. The University first looks to see whether the student is either a "United States citizen" or an "immigrant alien lawfully admitted for permanent residence"; if the student satisfies this initial requirement, the University must then determine whether the student (or his parents) are domiciled in Maryland.

Respondents are nonimmigrant aliens who hold G–4 visas. Pursuant to the University's tuition policy, they were denied lower in-state tuition rates despite the fact that they and their parents reside in Maryland. As explained by the Assistant Director of Admissions in a letter to respondent Clare B. Hogg, the principal reason for classifying respondents as out-of-state students for purposes of tuition was nonimmigrant status; as a secondary factor, the Assistant Director of Admissions noted that respondents would probably not be able to pass the second hurdle of domicile:[1]

"[T]he policy for determination of in-state status limits

---

[1] In rejecting the appeals of respondents Moreno and Otero from tuition

the ability to establish an in-state classification to United States citizens and immigrant aliens admitted to the United States for permanent residence. As the person upon whom you are dependent holds a G–4 visa, and as you hold a G–4 visa, in my judgment you are not eligible for an in-state classification.

"Also, the person upon whom you are dependent does not pay Maryland income tax on all earned income, including income earned outside the state. I feel this further weakens your request for reclassification as this is an important criteria in determination of domicile." Record 106.

Respondents brought suit in federal court alleging that the University's in-state tuition policy is, among other things, in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The District Court for the District of Maryland held that the University's policy creates an irrebuttable presumption in contravention of *Vlandis* v. *Kline*, 412 U. S. 441 (1973). The Court of Appeals for the Fourth Circuit affirmed. We granted certiorari to decide whether the lower courts were correct in their holding.

The Court, rather than deciding the due process issue upon

---

decisions of the Intercampus Review Committee, petitioner President of the University of Maryland also emphasized that the University precludes nonimmigrant aliens from in-state tuition status for reasons other than solely domicile:

"It is the policy of the University of Maryland to grant in-state status for admission, tuition and charge-differential purposes only to United States citizens and to immigrant aliens lawfully admitted for permanent residence. *Furthermore,* such individuals (or their parents) must display Maryland domicile. . . .

"The University's classification policy *also* distinguishes between domiciliaries and non-domiciliaries of Maryland." App. 12A (emphasis added).

See also Record 34, 55, 80, and 115.

which certiorari was granted, today certifies the following question to the Court of Appeals of Maryland: [2]

> "Are persons residing in Maryland who hold or are named in a visa under 8 U. S. C. § 1101 (a)(15)(G)(iv) (1976 ed.), or who are financially dependent upon a person holding or named in such a visa, incapable as a matter of state law of becoming domiciliaries of Maryland?"

I would unhesitatingly join the Court's certification if I felt that resolution of the question posed to the Court of Appeals of Maryland were necessary to decide the issue before us. But I am convinced that we can decide the due process issue without resolution of Maryland domicile law and thus that certification will only result in needless delay.

The University apparently classifies nonimmigrant aliens as out-of-state students for a number of reasons. All parties agree that a major factor is the University's conclusion that nonimmigrant aliens lack the legal capacity to become Maryland domiciliaries for tuition purposes. But this is not the *only* consideration underlying the classification, as is evidenced by the fact that citizenship or immigrant status is a requirement separate from and preceding domicile. According to

---

[2] As the Court notes, *ante,* at 668–669, n. 28, the question certified to the Court of Appeals of Maryland may not be answerable by a simple "yes" or "no." The Court asks as a general matter whether respondents are "incapable as a matter of state law of becoming domiciliaries of Maryland." The answer may be that they are incapable of establishing Maryland domicile for university tuition purposes but are still capable of becoming domiciliaries for other purposes such as divorce and personal jurisdiction. While in *Williamson* v. *Osenton,* 232 U. S. 619, 625 (1914), this Court expressed doubt whether the definition of domicile ever varies depending on the purpose for which domicile is being used, various state-court opinions since 1914 have shown that observation to be incorrect. See, *e. g., In re Estate of Jones,* 192 Iowa 78, 82, 182 N. W. 227, 229 (1921). The relevant issue in this case, of course, is whether respondents may establish Maryland domicile for university purposes, not whether they may become domiciled for purposes of divorce, etc.

the President of the University of Maryland, for example, the classification policy also "reflects the desire to equalize, as far as possible, the cost of education between those who support the University of Maryland through payment of the full spectrum of Maryland taxes, and those who do not." App. 12A. Holders of G–4 nonimmigrant visas are exempt from state income tax. By charging such nonimmigrant aliens higher out-of-state tuition, the University is able to better "equalize" the cost of education.[3]

Because the University's conclusion as to domicile plays a major role in its decision not to award nonimmigrant aliens in-state tuition status, counsel for petitioner admitted at oral argument that "it is entirely possible that the university would change its policy" in the face of a contrary decision by the Maryland Court of Appeals. Tr. of Oral Arg. 9. But a change in the University's in-state tuition policy would be neither automatic nor inescapable. The University might still decide that the other considerations such as cost equalization by themselves dictate continuation of the current policy. According to counsel for petitioner, "that judgment is one that would be made by the regents, and [as] I have suggested previously . . . it is well within the discretion of the regents." *Id.*, at 15.

The above facts clearly establish that the University of Maryland has not created an irrebuttable presumption. The University has not determined that domicile is the sole relevant factor in determining tuition rates and then prevented respondents from presenting proof on the question of domicile.[4]

---

[3] As the Court recognizes, *ante*, at 656–657, n. 5, the University of Maryland does not presently preclude students from in-state tuition status *solely* because their parents pay no state income tax. However, the record clearly demonstrates that cost equalization is *one* of the major concerns that have led the University to charge higher tuition rates to nonimmigrant aliens.

[4] The Court does not appear to argue that domicile is the *sole* reason for the University of Maryland's out-of-state classification of nonimmigrant aliens. Instead, the Court concludes that domicile is the " 'paramount'

Instead, the University has decided that, for a number of reasons *including* domicile and cost equalization, nonimmigrant aliens should pay a higher tuition rate than citizens and

and controlling concern" of the University. *Ante,* at 659, and n. 8. The Court supports its conclusions not with citations from the pleadings or affidavits of the parties but with references to briefs and memoranda filed by their counsel. Counsel for petitioner is, of course, charged with the legal defense of the validity of the policy statement promulgated by the Board of Regents and enforced by petitioner, but counsel is not authorized, in the absence of more authority than is shown here, either to rewrite or to predict how the Regents might rewrite its policy. Thus whatever the "surprise" that the Court foresees petitioner will experience from the view taken of the Regents' policy statement, see *ante,* at 659 n. 8, will stem not from this dissent but from the Court's willingness to attribute to ambiguous statements by counsel for a state agency the implied authority to rewrite the agency's regulations or to predict the manner in which the agency might rewrite them. Even the selected statements of counsel do not unequivocally support the Court's conclusion. As noted earlier, *supra,* at 673, while counsel for petitioner suggested that "the odds are reasonably high" that the University will modify its policy if the Court of Appeals of Maryland concludes that G–4 aliens can become domiciled in Maryland, he also emphasized that the University's other concerns, such as cost equalization, might lead the Regents to continue out-of-state classification of nonimmigrant aliens. Domicile, in other words, is not the sole concern of the University and may well not even be a "controlling concern." See also Brief for Petitioner 29–32; Tr. of Oral Arg. 19–21 (out-of-state classification of nonimmigrant aliens "serve[s] many purposes other than measuring domicile"; "the policy . . . is clearly intended to serve other purposes").

Even if the University declined to accord in-state tuition status to nonimmigrant aliens *solely* because of the University's conclusion that nonimmigrant aliens cannot be domiciled in Maryland for tuition purposes, no irrebuttable presumption would be presented. In *Vlandis* v. *Kline,* 412 U. S. 441 (1973), the University *presumed* that a student who was not domiciled in Connecticut at the time he first enrolled at the University of Connecticut could not become a Connecticut resident while attending the University, even though all the normal indicia of residence might be acquired during this period. Here, on the other hand, the University of Maryland merely reads Maryland law as holding that nonimmigrant G–4 aliens cannot satisfy the requirement for Maryland domicile for tuition purposes. This is purely and simply a question of state law. Respondents

immigrant aliens who are domiciled in the State. A student is allowed to present any and all evidence relevant to his or her status as a citizen or immigrant alien. In *Vlandis* v. *Kline,* this Court held only that where a State *"purport[s] to be concerned with residency,* it might not at the same time deny to one seeking to meet its test of residency the opportunity to show factors clearly bearing on that issue. 412 U. S., at 452." *Weinberger* v. *Salfi,* 422 U. S. 749, 771 (1975) (emphasis added).[5] Here, the University of Maryland's classification policy

> "does not purport to speak in terms of the bona fides of [domicile], but then make plainly relevant evidence of such bona fides inadmissible. As in *Starns* v. *Malkerson,* 326 F. Supp. 234 (Minn. 1970), summarily aff'd, 401 U. S. 985 (1971), the benefits here are available upon compliance with an objective criterion, one which the Legislature considered to bear a sufficiently close nexus with underlying policy objectives to be used as the test for eligibility. Like the plaintiffs in *Starns,* [respondents] are completely free to present evidence that they meet the specified requirements; failing in this effort, their only constitutional claim is that the test they cannot meet is not so rationally related to a legitimate legislative objective that it can be used to deprive them of benefits available to those who do satisfy that test." *Id.,* at 772.

Because it is clear that the University of Maryland has not created an irrebuttable presumption of non-Maryland domicile, it is unnecessary to decide, as the Court apparently believes

do not accuse petitioner of employing a nonuniversal, yet irrebuttable, presumption, but rather of misinterpreting Maryland domicile law. If the University of Maryland has misinterpreted state law, this is an error to be resolved by state, not federal, courts; no issue of federal constitutional law is presented.

[5] Because the tuition policy of the University of Maryland is controlled by *Weinberger* v. *Salfi* and not *Vlandis* v. *Kline,* the Court need not decide, as *amici* 29 States urge us to do, whether *Vlandis* should be overruled.

it is, whether "any 'irrebuttable presumption' would be universally true." *Ante,* at 661. And while the case *may* become moot *if* the Court of Appeals of Maryland decides that holders of G–4 visas can establish Maryland domicile and *if* the University changes its policy in light of that decision, the case is *not* moot *now* and there is no certainty that it will become moot in the future. There is, in summary, nothing today that prevents the Court from deciding the question presented.[6]

---

[6] Some Members of the Court may believe that resolution of the state domicile issue would be helpful in resolving respondents' equal protection claim. If the Court of Appeals of Maryland decides that nonimmigrant aliens holding G–4 visas cannot establish Maryland domicile for tuition purposes, *Starns* v. *Malkerson,* 326 F. Supp. 234 (Minn. 1970), summarily aff'd, 401 U. S. 985 (1971), clearly establishes that the University of Maryland can deny such nondomiciliaries lower in-state tuition rates without violating the Equal Protection Clause of the Fourteenth Amendment. If the Court of Appeals decides that holders of G–4 visas can establish Maryland domicile, on the other hand, resolution of respondents' equal protection claim may rest on the proper interpretation of *Nyquist* v. *Mauclet,* 432 U. S. 1 (1977).

The only question presented by the petition for certiorari, however, is: "Whether the decisions below should have applied Supreme Court precedents on irrebuttable presumptions, disregarded the principles articulated in *Weinberger* v. *Salfi,* 422 U. S. 749 (1975), and erroneously concluded that the University of Maryland's policy of denying in-state status for tuition and fee purposes to non-immigrants holding G–4 visas establishes an irrebuttable presumption violative of the due process clause of the fourteenth amendment to the United States Constitution?" Consideration of respondents' equal protection claim, which was never addressed below, may best be left initially to the lower courts on remand. Even if the Court ultimately decides to consider respondents' equal protection arguments, resolution of Maryland domicile law would seem irrelevant. Unlike the situation in *Nyquist,* the University of Maryland does not discriminate against *resident* aliens. Cf. 432 U. S., at 2, 4, 5–6, and n. 6, and 12. There thus would not appear to be any issue of suspect class and the University's in-state tuition policy need only be shown to be rationally related to a legitimate state interest. The University's concern with cost equalization alone would seem sufficient to support the line drawn by the University. See *Starns* v. *Malkerson, supra.*

While I cannot join in what I view as a needless and time-consuming certification, I do join in the Court's implied disapproval of the District Court's refusal to refer to Maryland courts the question of whether holders of G–4 visas can establish Maryland domicile. Upon concluding that the University's policy creates an irrebuttable presumption, the District Court was faced with the question of whether the presumption is universally true. The District Court proceeded to answer the question in the negative and enjoin the University's policy, even though petitioner had asked the District Court either to abstain or, apparently, to certify the question of domicile to the Court of Appeals of Maryland.[7] Because the Court of Appeals of Maryland had never addressed the question of domicile, petitioner's request should have been granted. By

---

[7] According to petitioner, he "urged both the district court and the court of appeals to defer to Maryland courts the question of whether the state law precluded G–4's from establishing Maryland domicile." Brief for Petitioner 35 n. 20. The record indicates that petitioner, in his answer to respondents' complaint, urged the District Court to "abstain from exercising any jurisdiction it may possess in this action until it shall have been heard and determined fully by the courts of Maryland." Record 117. Petitioner renewed the request in his motion for summary judgment and memorandum in support thereof. *Id.*, at 211, and 239–243. In reply, respondents urged the District Court, "should [it] elect to abstain, . . . to use the certification procedure provided by the Uniform Certification of Questions of Law Act, Ann. Code of Md., Courts and Judicial Proceedings, §§ 12–601–609 (1974). Under that Act the Court of Appeals of Maryland is empowered to answer questions of state law certified to it by the United States District Court which may be determinative and as to which it appears there is no controlling precedent." *Id.*, at 274. Respondents also went on to argue, however, that the District Court need neither abstain outright nor certify the question of domicile to the Court of Appeals of Maryland, since "the Maryland common law of domicile is not at issue in this case. No 'clarification' of the Maryland common law of domicile is needed." *Id.*, at 272. The District Court, although concluding that the Maryland law of domicile *is* relevant, declined to either abstain outright or certify the question of domicile to the Court of Appeals of Maryland.

deciding the question itself, the District Court risked invalidating a state policy that a later decision of the Maryland state courts might establish was clearly valid. Furthermore, as the Court emphasizes, "it is obviously desirable that questions of law which, like domicile, are both intensely local and immensely important to a wide spectrum of state government activities be decided in the first instance by state courts." *Ante,* at 663 n. 16.

In summary, I agree with the Court that important and controlling issues of state law should initially be decided by state, not federal, courts. But because I do not believe that resolution of the Maryland law of domicile is necessary to decide the due process question before us, I dissent from today's certification.[8]

---

[8] While I agree with the Court's conclusion that holders of G–4 visas are not prevented *as a matter of federal law* from establishing Maryland domicile, I find it unnecessary to address the five pages of dicta that accompany that conclusion. I am nonetheless troubled by the Court's unsupported dictum that the United States may not be able to deport, under certain unspecified circumstances, a G–4 alien who terminates his employment with an international treaty organization. *Ante,* at 667.