**Juan Carlos MORENO et al., Plaintiffs,**

v.

**John S. TOLL, President, University of Maryland, Defendant.**

**Civ. A. No. M–75–691.**

United States District Court,
D. Maryland.

April 17, 1980.

See also D.C., 480 F.Supp. 1116.

Alfred L. Scanlan, Bethesda, Md., and James R. Bieke, John Townsend Rich, and Raymond M. Bernstein, Washington, D. C., for plaintiffs.

David H. Feldman, and Robert A. Zarnoch, Asst. Attys. Gen., Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

This action was filed as a class action challenge[1] to the University of Maryland's

---

**1.** The plaintiff class was defined as follows: "All persons now residing in Maryland who are current students at the University of Maryland, or who chose not to apply to the University of Maryland because of the challenged policies but would now be interested in attending if given an opportunity to establish in-state status, or who are currently students in senior high schools in Maryland, and who

(a) hold or are named within a visa under 8 U.S.C. § 1101(a)(15)(G)(iv) or are financially dependent upon a person holding or named within such a visa."

"In-State Policy"[2] which precludes non-immigrant aliens from consideration for in-state status while enrolled at the University. The court has already addressed the plaintiffs' due process challenge to the policy.[3] Presently pending before the court are cross motions for summary judgment on the remaining issues raised under the Equal Protection Clause of the Fourteenth Amendment and the Supremacy Clause of the Constitution.

## I. The Equal Protection Claims

■ The plaintiffs' initial argument under the Equal Protection Clause is that the challenged portion of the University's In-State Policy is premised upon a classification based on alienage, and therefore is subject to strict scrutiny in accordance with the Supreme Court decisions in *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), *Sugarman v. Dougall*, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), *Examining Board v. Flores de Otero*, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976), and *Nyquist v. Mauclet*, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977). The defendant, however, contends that strict scrutiny is inappropriate on the following bases:

(1) The previous Supreme Court cases concerning discrimination against aliens in which a strict scrutiny test was applied all involved a statute or practice which allegedly discriminated against *resident* aliens (a term equated by the defendant with *immigrant* alien);

(2) since *immigrant* aliens are eligible for in-state status at the University, it is irrational to contend that the University's policy denies benefits on the basis of alienage;

(3) the rationale for according "suspect" class status is wanting in this case since nonimmigrants can decide to adjust to immigrant visa status;

(4) in-state consideration is not a necessity of life and, therefore, strict scrutiny is inappropriate;

(5) strict scrutiny should not be applicable since the University's policy is consistent with the purposes of federal immigration law; and

(6) in the dissent filed in a prior opinion of the Supreme Court in this case, Justice Rehnquist and Chief Justice Burger indicated that "[t]here . . . would not appear to be any issue of suspect class and the University's in-state tuition policy need only be shown to be rationally related to a legitimate state interest." *Elkins v. Moreno*, 435 U.S. 647, 676 n.6 [98 S.Ct. 1338, 1354 n.6, 55 L.Ed.2d 1338] (1978).

In determining the applicable standard in the present case, it is necessary to review briefly the recent Supreme Court decisions regarding the ability of the State to create legislative classifications on the basis of alienage.

Initially, it is clear that "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." *Graham*

*Moreno v. University of Maryland*, 420 F.Supp. 541, 564 (D.Md.1976).

**2.** The University of Maryland's In-State Policy makes Maryland domicile the test for granting in-state status to citizens and immigrant aliens. The Policy, along with the Board of Regents' "Clarifying Resolution" of June 23, 1978 expressly precludes consideration of eligibility for in-state status in the case of non-immigrant aliens enrolled at the University.

**3.** See the district court decision in *Moreno v. University of Maryland*, 420 F.Supp. 541 (D.Md.1976), aff'd, 556 F.2d 573 (4th Cir.), cert. granted, 434 U.S. 888, 98 S.Ct. 260, 54 L.Ed.2d 173 (1977). The Supreme Court, after hearing argument on the case, certified a question of

state law to the Maryland Court of Appeals, prior to entering a final order in the case. *Elkins v. Moreno*, 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978). Subsequent to the decision by the Maryland Court of Appeals (*Toll v. Moreno*, 284 Md. 425, 397 A.2d 1009 (1979)) the Supreme Court remanded the matter to the district court for further consideration due to material changes in the factual posture of the case. *Toll v. Moreno*, 441 U.S. 458, 99 S.Ct. 2044, 60 L.Ed.2d 354 (1979). On remand, the district court issued an opinion ruling on the remaining due process issues and setting forth the issues remaining for consideration. *Moreno v. Toll*, 480 F.Supp. 1116 (D.Md.1979).

*v. Richardson, supra,* 403 U.S. at 372, 91 S.Ct. at 1852. Thus, in the *Graham* case, the Supreme Court struck down Pennsylvania and Arizona statutes which denied welfare benefits to resident aliens or to aliens who had not resided in the United States for a requisite number of years, as being violative of the Equal Protection Clause. In subsequent cases the Court has expounded upon this doctrine.

For example, in *Examining Board v. Flores de Otero, supra,* Puerto Rico's virtual ban on the private practice of civil engineering by aliens was held unconstitutional by the Court, stating 426 U.S. at 602, 96 S.Ct. at 2281:

> "[*Graham v. Richardson, supra* ; *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); and *In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973)] establish that state classifications based on alienage are subject to 'strict judicial scrutiny.' *Graham v. Richardson,* 403 U.S. at 376, 91 S.Ct. at 1854. Statutes containing classifications of this kind will be upheld only if the State or Territory imposing them is able to satisfy the burden of demonstrating 'that its purpose or interest is both constitutionally permissible and substantial; and that its use of the classification is "necessary . . . to the accomplishment" of its purpose or the safeguarding of its interest.' *In re Griffiths,* 413 U.S. at 721–722, 93 S.Ct. at 2854–2855 (footnotes omitted)."

The Court went on to note that two rationales exist for the principles set forth in these cases:

> "The first, based squarely on the concepts embodied in the Equal Protection Clause of the Fourteenth Amendment and in the Due Process Clause of the Fifth Amendment, recognizes that

'[a]liens as a class are a prime example of a "discrete and insular" minority. . . for whom . . . heightened judicial solicitude is appropriate.' *Graham v. Richardson,* 403 U.S. at 372, 91 S.Ct. at 1852 . . . . The second, grounded in the Supremacy Clause, Const., Art. VI, cl. 2, and in the naturalization power, Art. 1, § 8, cl. 4, recognizes the Federal Government's primary responsibility in the field of immigration and naturalization." (Citations omitted).

426 U.S. at 602, 96 S.Ct. at 2281.

Similarly, in *Nyquist v. Mauclet,* 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977), the Supreme Court held unconstitutional a New York statute which barred certain resident aliens from eligibility for state financial assistance for higher education.[4] The appellants in *Nyquist* sought to avoid strict scrutiny analysis by the Court by arguing that the state statute in question distinguished "only within the heterogeneous class of aliens and [did] not distinguish between citizens and aliens *vel non.*" *Id.* at 8, 97 S.Ct. at 2125. Nevertheless, the Court applied strict scrutiny analysis in striking down the statute, as it stated:

> "The important points are that [the statute] is directed at aliens and that only aliens are harmed by it. The fact that the statute is not an absolute bar does not mean that it does not discriminate against the class."

*Id.* at 9, 97 S.Ct. at 2125.

As previously mentioned, the defendant's initial and principal argument against the application of the doctrine of strict scrutiny here is premised upon the observation that all prior Supreme Court cases cited have dealt with classifications of "resident" aliens, rather than with "non-immigrant" aliens. Accordingly, the defendant argues that nothing in the prior Supreme Court

---

4. The statute in question in *Nyquist v. Mauclet, supra,* provided as follows:

> "Citizenship. An applicant (a) must be a citizen of the United States, or (b) must have made application to become a citizen, or (c) if not qualified for citizenship, must submit a statement affirming intent to apply for United States citizenship as soon as he has the

qualifications, and must apply as soon as eligible for citizenship, or (d) must be an individual of a class of refugees paroled by the attorney general of the United States under his parole authority pertaining to the admission of aliens to the United States." N.Y.Educ.Law § 661(3) (McKinney Supp. 1976).

cases requires the application of strict scrutiny in the examination of state discrimination against nonimmigrant aliens. In support of this contention, the defendant refers the court to G. Rosberg, *The Protection of Aliens from Discriminatory Treatment by the National Government,* Sup.Ct.Rev. 275, 312 (1977), wherein the author states:

"The Supreme Court . . . has not held ·it unconstitutional to discriminate against nonimmigrant aliens. It has not even suggested that such aliens are within the class protected under the suspect classification doctrine."

Since no case law is cited in support of the defendant's position,[5] the issue of whether state classifications which narrowly discriminate against nonimmigrant aliens should be examined under strict scrutiny analysis appears to present a novel question of law.

In attempting to distinguish the present case from prior Supreme Court decisions which applied strict scrutiny analysis to classifications of "resident" aliens, *See Graham v. Richardson, supra; Sugarman v. Dougall, supra; In re Griffiths, supra; Nyquist v. Mauclet, supra,* the defendant appears to adopt a definition of "resident" alien which excludes a nonimmigrant status from its umbrella. This definition, in turn, appears to have its genesis in the article by Professor Rosberg:

"As defined in the federal immigration laws, a resident- or immigrant-alien is a person admitted for permanent residence, entitled to work and live anywhere in the country and eligible for naturalization af-

ter five years of residence. A non-resident- or nonimmigrant-alien is a person admitted for a fixed period of time determined prior to entry . . . . No amount of residence will make a nonimmigrant eligible for naturalization."

G. Rosberg, *The Protection of Aliens from Discriminatory Treatment by the National Government, supra* at 277. Under Professor Rosberg's analysis, the terms "immigrant" and "resident" are synonymous, as are the terms "nonimmigrant" and "nonresident". This court, however, has concluded that this definition of these terms is erroneous, both in light of the definitions contained in the Immigration and Nationality Act itself and of usage of the terms in relevant case law.

The Immigration and Nationality Act defines the term "residence" as follows:

"The term 'residence' means the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent. Residence shall be considered continuous for the purposes of sections 1482 and 1484 of this title[6] where there is continuity of stay but not necessarily an uninterrupted physical presence in a foreign state or states or outside the United States."

8 U.S.C. § 1101(a)(33).

Under this definition a "resident" alien is one whose place of general abode is within the United States. Resident aliens can, therefore, be further classified as either

---

**5.** The court and the parties have found no case which addresses this issue. The defendant, however, does refer this court to the cases of *Shames v. State of Nebraska,* 323 F.Supp. 1321 (D.Neb.1971), aff'd. 408 U.S. 901, 92 S.Ct. 2478, 33 L.Ed.2d 321 (1972); *DeTenorio v. Lightsey,* 589 F.2d 911 (5th Cir. 1979), *cert. den.* 444 U.S. 831, 100 S.Ct. 59, 62 L.Ed.2d 39 (1979); and *Hernandez v. Houston Independent School District,* 558 S.W.2d 121 (Tex.Civ.App.1977) in support of his position. These cases, however, are unpersuasive on this particular issue, in that both *Shames* and *DeTenorio* concern state statutes limiting the rights of *nonresident* aliens, *i. e.* those living in foreign countries, to inherit property in the United States, and *Hernandez* deals with a Texas statute denying free education to *illegal* aliens. The defendant also

cites *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), but that case specifically deals with the rights of Congress to create legislative classifications based on alienage. *Mathews,* therefore, does not address the issue of the state's power to discriminate on the basis of alienage.

**6.** 8 U.S.C. § 1482 deals with the circumstances under which dual nationals will lose their United States citizenship due to continued residence in a foreign state of birth.

8 U.S.C. § 1484 deals with the circumstances under which a naturalized national may lose his United States citizenship due to continuous residence in a foreign state.

"immigrant" or "nonimmigrant", the chief basis for the distinction between the two being the statutory recognition of temporal limits inherent in nonimmigrant status. Immigrant aliens are referred to as being "lawfully admitted for permanent residence", i. e. being "accorded the privilege of residing *permanently* in the United States." 8 U.S.C. § 1101(a)(20). Nonimmigrant aliens, by contrast, are admitted for temporary residence.[7] Nonimmigrant aliens are ineligible to become naturalized citizens, because they are not admitted for permanent residence in accordance with the statutory requirements. *See* 8 U.S.C. § 1427(a). Nonimmigrant aliens may, however, be classified as resident aliens if their principal dwelling place is within the United States.[8] Thus the court finds that the term "resident alien", as used in prior Supreme Court decisions dealing with the state's power to classify on the basis of alienage, means those aliens, either immigrant or nonimmigrant, who maintain their place of general abode within the United States.

Given the above definition of "resident alien", the defendant's position presumably is that the prior Supreme Court cases mandate that strict scrutiny analysis be applied

in cases of state classifications which discriminate broadly against resident aliens, but that the Court has not yet addressed the question of discriminate classifications of an identifiable subclass of resident aliens, i. e. nonimmigrant aliens.

The chief factor which distinguishes nonimmigrant resident aliens from other resident aliens is that nonimmigrants are admitted only as "temporary" residents of the United States. Accordingly, regardless of the duration of a nonimmigrant's residence in this country, he is ineligible for citizenship unless he changes his visa status to that of an alien admitted for permanent residence, i. e. an immigrant alien. Nonimmigrant aliens, therefore, have a lesser degree of national affinity than immigrant aliens since the former will not, as a matter of course, become eligible for citizenship. This fact, however, is an insufficient justification for allowing the states greater latitude to discriminate against nonimmigrant aliens. As was stated by the Supreme Court in *Nyquist v. Mauclet, supra* 432 U.S. at 10, 97 S.Ct. at 2126:

"The first purpose offered by the appellants, directed to what they describe as some 'degree of national affinity' . . . [9]

**7.** Nonimmigrant aliens do not constitute a homogeneous class. The statute lists 12 separate categories of aliens who qualify for classification as nonimmigrants. See 8 U.S.C. § 1101(a)(15)(A)–(L). Each category accords special immigration treatment to a classification of aliens in recognition of their specialized purpose or function in coming to the United States. Nonimmigrant aliens are exempted from the numerical limitations which are placed upon the entry of immigrant aliens. Accordingly, aliens seeking admission are deemed to be immigrants unless they can prove that they fall within one of the statutorily defined nonimmigrant classifications. 8 U.S.C. § 1184(b).

**8.** This proposition is supported by negative inferences derived from Supreme Court cases which have discussed the rights of nonresident aliens. Although the term "nonresident alien" is not specifically defined by statute, the Supreme Court has repeatedly used the term in reference to aliens living outside the United States. *See, e. g., Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); *Gorun v. Fall,* 393 U.S. 398, 89 S.Ct. 678, 21 L.Ed.2d 628 (1969); *Zschernig v. Miller,* 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968);

*Incres Steamship Co., Ltd. v. International Maritime Workers Union,* 372 U.S. 24, 83 S.Ct. 611, 9 L.Ed.2d 557 (1963); *Kolovrat v. Oregon,* 366 U.S. 187, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961); *Mackey v. Mendoza-Martinez,* 362 U.S. 384, 80 S.Ct. 785, 4 L.Ed.2d 812 (1960); *Jay v. Boyd,* 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242 (1956); *Kwong Hai Chew v. Colding,* 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953); *Johnson v. Eisentrager,* 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950); *Commissioner v. Wodehouse,* 337 U.S. 369, 69 S.Ct. 1120, 93 L.Ed. 1419 (1949); *Clark v. Allen,* 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947). These cases support this court's conclusion that the terms "resident" and "nonresident" alien as used by the Supreme Court in the past, refer solely to the question of whether the alien is present and dwelling in fact in the United States and not to the alien's status as immigrant or nonimmigrant. 8 U.S.C. § 1101(a)(33).

**9.** As previously set forth in note 4, the statute under consideration in *Nyquist* only discriminated against resident aliens who had not applied for citizenship, or if not qualified for citizenship, would not submit a statement affirming an intent to become a citizen when qualified.

is not a permissible one for a State. Control over immigration and naturalization is entrusted exclusively to the Federal Government, and a State has no power to interfere."

The fact that nonimmigrant aliens may not acquire citizenship in the United States is a fact which is exclusively controlled by Congress. Therefore, a state has no power to place additional burdens on nonimmigrants solely on the basis of their visa status as dictated by Congress.

The court concludes that the Supreme Court cases cited have in principle wrapped all resident aliens, both immigrant and nonimmigrant, in the suspect classification blanket. The judicial protection accorded to aliens as a suspect class was based upon a recognition that aliens constitute a "discrete and insular minority" for whom "heightened judicial solicitude is appropriate". See, Graham v. Richardson, supra 403 U.S. at 372, 91 S.Ct. at 1852. This treatment is seemingly premised on the aliens' minority status in the community, not their potential citizen status. Accordingly, the court believes that existing case law demands that states justify discriminate classifications of resident aliens, whether immigrant or nonimmigrant, under a strict scrutiny standard.[10]

■ The defendant has presented the court with several additional alternate arguments against the application of strict scrutiny analysis in this case. First, the defendant stresses that the In-State Policy does not discriminate against all aliens,[11] in that it only precludes consideration for in-state status to all nonimmigrant aliens.

This fact, however, is unimportant, for as the Court stated in Nyquist, the relevant facts in determining that strict scrutiny should apply are that the policy is directed at aliens, albeit only the subclass of nonimmigrant aliens in the present case, and that only aliens are harmed by the policy. The subclass of nonimmigrant aliens seemingly constitutes a "discrete and insular minority for whom judicial solicitude is appropriate," Graham v. Richardson, supra at 372, 91 S.Ct. at 1852, since their nonimmigrant status is dictated by federal law. Cf. 8 U.S.C. § 1101(a)(15).[12]

The defendant also argues that the University's policy harms not only aliens but that it also denies in-state preference to out-of-state students. (See Paper 42, p. 4). This argument, however, is unpersuasive since the policy subjects all citizens and immigrant aliens to a domicile test in order to qualify for in-state benefits whereas nonimmigrant aliens are precluded from qualifying under the same test. The fact that one of the effects of the statute is to deny in-state status to out-of-state students is immaterial in determining whether the policy denies equal protection to nonimmigrant aliens who reside within the state. The policy is naturally based on the premise that in-state status should only be granted to persons who reside within the state. The question, therefore, is whether the policy denies equal protection to nonimmigrants as a "discreet and insular" minority of state residents. It appears to do so.

■ The defendant also seeks to avoid strict scrutiny analysis by claiming that the benefit sought is not a "necessity of life."

10. The one exception to this principle is the "governmental functions" doctrine which will be discussed infra in connection with the Supreme Court decision in Foley v. Connelie, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978).

11. The mere fact that some aliens do obtain In-State status consideration under the policy does not imply that the policy should not still be subject to strict scrutiny. As Nyquist indicated, the test is whether the policy impermissibly discriminates against aliens, not necessarily whether it discriminates against all aliens.

12. The fact that a nonimmigrant alien may opt to adjust his immigration status to that of a permanent alien does not redeem the University's Policy. In Nyquist, the statute challenged provided that aliens would be eligible for the educational loans in question if they either applied to become United States citizens or submitted a statement of intent to apply for citizenship when eligible. The Nyquist court struck down the statute, despite the fact that those challenging the statute could have qualified for the loans they sought merely by deciding to apply for citizenship. Nyquist v. Mauclet, supra, 432 U.S. at 11, 97 S.Ct. at 2126.

The defendant cites the recent Supreme Court opinion in *Foley v. Connelie*, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978). In this context, however, the defendant's reliance on *Foley* is misplaced. In *Foley*, the Court upheld a New York statute limiting appointment to the state police force to United States citizens by applying a rational basis, rather than a strict scrutiny, test. The application of this less demanding standard, however, was clearly limited to alienage classifications in matters involving the state's "historical power to exclude aliens from participation in its democratic political institutions." *Id.* at 295, 98 S.Ct. at 1070. As the Court stated:

"The essence of our holdings to date is that although we extend to aliens the right to education and public welfare, along with the ability to earn a livelihood and engage in licensed professions, the right to govern is reserved to citizens."

*Id.* at 297, 98 S.Ct. at 1071. The defendant would have the court construe this statement to mean that strict scrutiny should only apply to the "necessities of life", such as those indicated. Taken in context, however, it is apparent that the case stands for a limited exception to the general strict scrutiny standard, and that the exception will apply only in cases involving state regulation of one of the basic functions of government. This meaning is apparent in light of the Court's later decision in *Ambach v. Norwick*, 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979), where it stated:

"The rule for governmental functions, which is an exception to the general standard applicable to classifications based on alienage, rests on important principles inherent in the Constitution. The distinction between citizens and aliens, though ordinarily irrelevant to private activity, is fundamental to the definition and government of a State."

*Id.* at 75, 99 S.Ct. at 1593. Thus the strict scrutiny approach is generally applicable to State classifications based on alienage, excepting those dealing with governmental functions in which cases the less stringent rational basis test will be applied.

Given the above considerations, the Court finds that strict scrutiny is the applicable test in examining the constitutionality of the University's In-State Policy.[13] Accordingly, the statute may be upheld only if the defendant satisfies the burden of demonstrating that:

"[the policy's] purpose or interest is both constitutionally permissible and substantial, and that [the State's] use of the classification is necessary to the accomplishment of its purpose or the safeguarding of its interest."

*Examining Board v. Flores de Otero, supra,* 426 U.S. at 602, 96 S.Ct. at 2281 (citing *In re Griffiths, supra* 413 U.S. at 721–722, 93 S.Ct. at 2854–2855).

The defendant's Memorandum in support of his Motion for Summary Judgment (Paper 36) discusses the interests served by the In-State Policy in terms of a rational basis standard, rather than a strict scrutiny standard.[14] The purposes purportedly served by the Policy have been set forth by the defendant as follows:

(1) limiting the University's expenditures by granting a higher subsidy toward the expenses of providing educational services to that class of persons who, as a class, are more likely to have a close affinity to the State and to contribute more to its economic well-being;

(2) achieving equalization, between the affected classes, of the expenses of providing educational services;

(3) efficiently administering the University's in-state determination and appeals process; and

13. The defendant's argument that Justice Rehnquist and Chief Justice Burger have already indicated that *Nyquist* is not controlling in the present case is unpersuasive, as this statement was merely dicta in a dissenting opinion. Further, the court notes that both Justices filed dissents in *Nyquist*.

14. The plaintiffs have noted that the defendant conceded in his brief to the Court of Appeals for the Fourth Circuit that the University's policy "will not withstand a 'strict scrutiny' Equal Protection standard." (Br. at 32).

(4) preventing disparate treatment among categories of nonimmigrants with respect to admissions, tuition, and charge-differentials.

Although these factors would arguably constitute a sufficient justification for the University's policy under a rational basis analysis, they fail to meet the high burden which the defendant faces under a strict scrutiny standard.

Citizens and immigrant aliens do not necessarily have a "closer affinity" to the State than do nonimmigrant aliens. This is particularly apparent in the context of this case, since it has already been determined that, as a matter of both federal and state law, G–4 nonimmigrant aliens are capable of acquiring domicile in the state of Maryland. In addition, the state affinity rationalization was specifically considered and rejected by the Supreme Court in *Nyquist v. Mauclet, supra.*

Similarly, cost equalization is an insufficient justification for the University's policy. As this court has previously noted:

"Nonimmigrant aliens, even those such as plaintiffs' fathers whose salaries are exempt from state income tax, who have resided in Maryland for 10 or 15 years, as have plaintiffs' fathers, might well have contributed far more financial support to the University of Maryland through payment of real property, sales and other taxes than would have a student, financially independent for at least 12 months, who maintained a domicile in Maryland for 6 months prior to his class registration. Yet such a student, who conceivably could have contributed almost noth-

ing to the Maryland tax base, is allowed to prove Maryland domicile under the 'In-State Policy.'"

*Moreno v. University of Maryland,* 420 F.Supp. at 560.[15]

The rationalization that the preclusion of nonimmigrants promotes the efficient administration of the University's policy is patently insufficient under a strict scrutiny analysis. *Cf. Memorial Hospital v. Maricopa County,* 415 U.S. 250, 267, 94 S.Ct. 1076, 1086, 39 L.Ed.2d 306 (1974). It is apparent that the University already has an administrative procedure through which eligibility for in-state status may be determined on a case-by-case basis when necessary. Thus any questions of in-state eligibility for non-immigrants could easily be processed through the University's existing administrative procedures. The fact that this would result in an increased cost to the University is an insufficient justification for the Policy. *Sugarman v. Dougall, supra* 413 U.S. at 646, 93 S.Ct. at 2849.

Finally, the University's rationalization that the present policy prevents disparate treatment among categories of nonimmigrant aliens is not persuasive. If that portion of the University's policy which limits consideration for in-state eligibility to citizens and immigrant aliens were stricken, then nonimmigrant aliens would be uniformly eligible for consideration for in-state status under the terms of the policy applicable to citizens and aliens alike. The fact that certain categories of nonimmigrants would, as a matter of law, prove to be ineligible for in-state treatment is an insufficient basis for precluding consideration of

---

**15.** Cost equalization is the most persuasive rationale set forth by the defendant in support of the Policy. As summarized by the defendant, the contention is as follows:

"The University's requirement that nonresidents and nonimmigrants pay out-of-state rates bears a rational relationship to the State's purpose of financing, operating, and maintaining the University of Maryland. In addition, the University's in-state policy is a rational attempt to achieve cost equalization between those who have and those who have not recently contributed to the State's economy through employment, tax payments, and

expenditures, *viz.,* nonimmigrants and other nonresidents." (Paper 36, p. 16–17).

As the defendant's argument implies, however, and as was previously conceded in the defendant's Brief to the Fourth Circuit Court of Appeals, although this argument would be sufficient under a rational basis analysis, it is insufficient under a strict scrutiny standard. Under a strict scrutiny test it is incumbent upon the State to show that its interest is constitutionally permissible and substantial and that the questioned classification is necessary to the fulfillment of that interest. *See, Examining Board v. Flores de Otero, supra.*

those who could otherwise qualify under the terms of the policy.

For the foregoing reasons, the Court finds that the University of Maryland's In-State Policy violates the Equal Protection Clause of the Fourteenth Amendment to the extent that it denies nonimmigrant aliens consideration for eligibility for in-state status.

## II. *The Supremacy Clause Claims*

The plaintiffs contend that the University's In-State Policy violates the Supremacy Clause on two grounds. First, the plaintiffs claim that the Policy conflicts with international agreements entered into by the United States. Second, the plaintiffs argue that the Policy conflicts with the exclusive authority of Congress over immigration.

### A. *Interference With International Agreements*

■ The substance of the plaintiffs' contention on this ground is that the University's Policy conflicts with the international agreements entered into by the United States which establish the international organizations employing the plaintiffs' fathers in this country. Specifically, the plaintiffs contend that the Policy interferes with the provisions in the international agreements which preclude both Federal and State taxation of the salaries paid to non-American employees of the designated organizations. The purported conflict with these agreements stems from the fact that one of the University's express justifications for the Policy is to promote cost equalization for those individuals subject to the full spectrum of Maryland taxes. Thus, largely because the plaintiffs' fathers are not subject to the state income tax, they are not accorded the benefits derived from in-state classification.

The defendant maintains that there is no direct conflict between the University's Policy and the international agreements referred to by the plaintiff. The only arguable conflict which exists is between one of the rationales advanced in support of the University's Policy and the income tax exemptions granted by the international agreements. The defendant contends that this is insufficient evidence of an impermissible conflict under the Supremacy Clause.

■ As stated by the Supreme Court in *DeCanas v. Bica*, 424 U.S. 351, 357 n.5, 96 S.Ct. 933, 937 n.5, 47 L.Ed.2d 43 (1976), "the Supremacy Clause requires the invalidation of any state legislation that burdens or conflicts in any manner with any federal laws or treaties." An indirect or hypothetical conflict is insufficient, however, to render invalid a state statute or policy, for the Supreme Court has stated that the reserved powers of the State "should be respected unless there is a *clear collision* with a national law which has the right of way under the Supremacy Clause of Article VI." *Kesler v. Dept. of Public Safety*, 369 U.S. 153, 172, 82 S.Ct. 807, 818, 7 L.Ed.2d 641 (1962) (Emphasis added). *Cf., Seagram & Sons v. Hostetter*, 384 U.S. 35, 45, 86 S.Ct. 1254, 1260, 16 L.Ed.2d 336 (1966); *Huron Cement Co. v. Detroit*, 362 U.S. 440, 446, 80 S.Ct. 813, 817, 4 L.Ed.2d 852 (1960).

In this case it is apparent that there is no "clear conflict" between the policies in question. The University's Policy seeks to confer certain economic benefits on individuals closely affiliated with the State of Maryland. The mere fact that one of the factors which is considered in determining eligibility for this benefit is whether or not the applicant's income is taxed by Maryland does not necessarily imply that the policy conflicts with the tax policies contained in the relevant international agreements. The "conflict" between these policies, in and of itself, is too attenuated to warrant invalidating the University's Policy.

### B. *Interference With Congress' Exclusive Control Over Immigration.*

■ The plaintiffs contend that the University's Policy violates the Supremacy Clause in that it encroaches upon the exclusive federal power over immigration and naturalization. The defendant, however, maintains that the Policy falls within the range of discretion afforded to states in dealing with aliens within their borders.

Initially, as the Supreme Court noted in *DeCanas v. Bica*, 424 U.S. 351, 355, 96 S.Ct. 933, 936, 47 L.Ed.2d 43 (1966):

". . . the Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus *per se* pre-empted by [the] constitutional power [to regulate immigration], whether latent or exercised."

The Court went on to explain that a regulation of immigration "is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id.*

Similarly, as the Court stated in *Examining Board v. Flores de Otero, supra* 426 U.S. at 604–605, 96 S.Ct. at 2282:

"We do not suggest, however, that a State, Territory, or local government, or certainly the Federal government, may not be permitted some discretion in determining the circumstances under which it will employ aliens or whether aliens may receive public benefits or partake of public resources on the same basis as citizens. *In each case, the governmental interest claimed to justify the discrimination is to be carefully examined in order to determine whether that interest is legitimate and substantial, and inquiry must be made whether the means adopted to achieve the goal are necessary and precisely drawn.*" (Emphasis supplied).

As this section of the Court's opinion indicates, the standard utilized to uphold a state regulation dealing with benefits to be accorded to aliens is essentially the strict scrutiny analysis previously discussed in reference to the Equal Protection arguments. Thus, for the reasons previously set forth, the defendant has failed to meet the high burden required in order to justify the discriminatory treatment of nonimmigrant aliens under the University's Policy. This

court, therefore, finds the Policy to be unconstitutional under both the Equal Protection Clause of the Fourteenth Amendment and the Supremacy Clause of the Constitution.[16]

III. *Conclusion*

Accordingly it is ORDERED this 17th day of April, 1980 by the United States District Court for the District of Maryland, that the plaintiffs' Motion for Summary Judgment is hereby GRANTED and the defendant's Motion for Summary Judgment is hereby DENIED.

---

16. The court specifically notes that this decision does not require that domicile, as defined under state law, be the test for determining eligibility for in-state status at the University of Maryland. The only matter which the Court has decided is that the standards which the University utilizes in determining in-state eligibility must either be uniformly applied to all citizens and resident aliens, or else any discriminate treatment of aliens must withstand strict scrutiny analysis, as set forth in this opinion, in order to be upheld.