Germmaine HEIN, Plaintiff,

v.

ARKANSAS STATE UNIVERSITY, and its board of trustees, Larry Ross, Harold Thomas, Bill Phillips, Charlotte Bradbury, Harold Perrin, Dr. Leslie Wyatt, President, and Scott Lewis, Executive Assistant to the President, in their official and individual capacities, Defendants.

No. J–C–95–218.

United States District Court, E.D. Arkansas, Jonesboro Division.

July 30, 1997.

R. Theodor Stricker, Jonesboro, AR, for Plaintiff.

Leigh Anne Yeargan, Arkansas Atty. General's Office, Little Rock, AR, for Defendants.

## ORDER

STEPHEN M. REASONER, Chief Judge.

Pending before the Court is defendants' Motion for Summary Judgment (Doc. Num.31). For the reasons hereinafter stated, the Motion is granted.

### I. STATEMENT OF FACTS

Plaintiff, Germmaine Hein, is a citizen of the nation of Uruguay. Ms. Hein was born in Uruguay and moved to Bearing Springs, Michigan on August 18, 1991. Sometime during 1991, the plaintiff married Rudolf Hein. At the time of the marriage Mr. Hein was also a citizen of Uruguay and had been admitted to the United States on a permanent immigrant visa. The plaintiff, however, was admitted to the United States under a non-immigrant student visa (F-1).

While in Bearing Springs, Ms. Hein enrolled at Andrew University to study English as a second language. The plaintiff and her husband lived in Bearing Springs until December 1991, at which time the couple moved to Jonesboro. Mr. Hein, who was a minister, had been assigned a position in a local church. In January of 1992, Ms. Hein enrolled in the Center for English as a Second Language program at Arkansas State University. Ms. Hein subsequently completed the Second Language program. On May 28, 1992, she applied for student enrollment at ASU as an international student and was accepted by the University.

In June of 1992, after residing in Arkansas for six months, the plaintiff sought status as an in-state resident for tuition purposes in the nursing program at Arkansas State University. University officials denied her application. The University's denial of in-state tuition status was based on its construction of the Arkansas Department of Higher Education's "Residency Classification for Tuition Purposes by Public Colleges and Universities." Pursuant to these regulations, "[a] student should be classified as an instate student for tuition purposes only if his or her legal residence is located in Arkansas." *See* Exhibit "B" to Plaintiff's Memorandum In Response to Defendants' Motion to Dismiss, "Residency Classification for Tuition Purposes by Public Colleges and Universities," ¶ 1. To acquire such residence in the State of Arkansas, ". . . an individual must have established a legal home of permanent character, resided in Arkansas for six continuous months, and have no present intention of changing residence to a location outside Arkansas." *Id.* ¶ 7. Determination of legal residence for tuition purposes is based upon a ". . . review by institutional officials of *all relevant circumstances* which together may reasonably demonstrate legal residence and state of mind regarding residency intent." *Id.* ¶ 8 (emphasis added).

According to the University, Ms. Hein could not meet these qualifications because she was present in the United States on a F-1 student visa. In order to be granted a F-1 student visa, the plaintiff certified the following:

I certify that I seek to enter or remain in the United States temporarily, and solely for the purpose of pursuing a full course of study at the school named on Page 1 of this form. *See* Defendant's Exhibit 3 to Motion for Summary Judgment, Certificate of Eligibility for Non–immigrant (F–1) Student Status— For Academic and Language Studies, ¶ 11. The University concluded that Ms. Hein's status as a F–1 non–immigrant precluded her, as a matter of law, from forming the requisite intent to become an Arkansas resident.

Ms. Hein contends that during the course of her nursing studies she continued to pursue resident tuition status. This included presenting the University with proof that her husband had been naturalized in May of 1994. According to the plaintiff, this fact was evidence of her intent to remain in the United States and to make Arkansas her permanent home, as required by the Department of Higher Education's regulations. The efforts of the plaintiff to gain in-state residency status are documented by factual evidence. This evidence includes a letter dated January 19, 1994 from the University to Mr. Theodor Stricker, the plaintiff's attorney. This letter demonstrates that the plaintiff was actively pursuing in-state residency status during her enrollment at ASU. *See* Exhibit "A" to Plaintiff's Memorandum In Response to Defendants' Motion to Dismiss, Letter dated January 19, 1994 from Scott W. Lewis to Theodor Stricker.

The defendant asserts that Ms. Hein was not eligible for in-state tuition status because she never attempted to change her immigration status from F–1. Furthermore, the University contends that Ms. Hein never submitted an application for immediate relative visa or permanent alien visa to ASU. These factors would have demonstrated an intent on the part of the plaintiff to make Arkansas her permanent home.

Plaintiff asserts that during the course of her attempts to gain resident status, she never received a copy of any preexisting official policy adopted by the University regarding non–immigrant aliens and tuition classifications, nor was she afforded a formal hearing on the matter of her status or given written notice of the appeals procedure. Ms. Hein was charged tuition at the nonresident

tuition rate throughout her education at ASU. In May of 1995, Ms. Hein graduated from ASU with a degree in nursing.[1] She now resides with her husband in Monroe, Louisiana and has since May of 1996. However, at the time she filed this lawsuit, Ms. Hein was enrolled as a nursing student at ASU. *See* Amended Complaint, ¶ 4.

## II. PROCEDURAL HISTORY

The Amended Complaint alleges that the plaintiff moved to the State of Arkansas from her former home in Michigan on December 12, 1991 with the intent to make Arkansas her home and domicile. Further, by denying the plaintiff in-state residency status, the defendant is alleged to have violated various constitutional rights of the plaintiff. Among these are the following:

1. That by adopting the rules and regulations whereby a legal resident and domiciliary of the State of Arkansas can be denied recognition as a resident of the State of Arkansas for tuition and registration purposes, the defendant has attempted to assume or usurp powers vested only in the legislature of the State of Arkansas under its constitutional authority. Said rules and regulations are without any legal effect since they were enacted without any power or authority;

2. That the rules and regulations constitute an infringement on the freedom of movement protected by the Privileges and Immunities clause of the 14th Amendment of the United States Constitution;

3. That the rules and regulations constitute an unreasonable and invidiously discriminatory classification and, therefore, are a denial of the equal protection of laws under the 14th Amendment of the United States Constitution;

4. That the rules and regulations place a discriminatory burden on an alien resident lawfully within the United States and conflict with the constitutionally derived federal power to regulate im-migration in violation of the Supremacy Clause of the U.S. Constitution;

5. That the rules and regulations constitute a violation of the due process, equal protection and immunity clauses of the Constitution of the State of Arkansas; and

6. That defendants exceeded and abused their discretion by denying the plaintiff's claim for registration as a resident of the State of Arkansas; that the decision was erroneous and contrary to law, and the entire process was arbitrary and unjust.

*See* Amended Complaint, ¶¶ 18–24. Plaintiff prays that she be awarded a refund of the nonresident tuition fee she paid in the amount of $6,928.00, plus interest. Additionally, she requests that she be registered with ASU as a resident of the State of Arkansas for future tuition purposes and she seeks an order which would require ASU to cease applying a citizenship requirement to the plaintiff and to any other person in the same or similar circumstances. Finally, plaintiff requests her costs and attorney's fees incurred in prosecuting this case.

By Order of the Court dated May 7, 1996, plaintiff's monetary claims against ASU and the remaining defendants in their official capacities were dismissed pursuant to the Eleventh Amendment. The Court noted that "[a]s an agency of the State of Arkansas, Arkansas State University, along with its Board of Trustees and the individual University officials named in this suit, are immune from damages claims under the Eleventh Amendment to the United States Constitution, and Art. 5 § 20 of the Arkansas Constitution." Thus, the only remaining claims before the Court are for monetary damages against the individual defendants and the claims for prospective equitable relief.

The defendant has moved for summary judgment based on the following grounds: (1) plaintiff has failed to comply with Federal Rule of Civil Procedure 8; (2) this Court lacks jurisdiction over the subject matter of this controversy; (3) the issues before the

---

**1.** Plaintiff alleges that she wishes to pursue a graduate degree in nursing at ASU, but cannot do so because of the residency requirements.

Court are moot; (4) defendants are entitled to qualified immunity; and (5) plaintiff has failed to state a claim. Each of these arguments will be addressed in turn.

### III. SUMMARY JUDGMENT STANDARD

It is well-settled that the party moving for summary judgment has the burden of demonstrating that the Rule 56(c) test is satisfied and that he is entitled to judgment as a matter of law. Under Rule 56(c), the moving party must prove that there is "no genuine issue as to any material fact." FED. R. CIV. P. 56(c). Because the burden is on the movant, the evidence presented is always construed in favor of the party opposing the motion and he is given the benefit of all favorable inferences that can be drawn from it. *McSpadden v. Mullins,* 456 F.2d 428, 430 (8th Cir.1972).

Rule 56 first imposes a burden of production on the moving party to make a prima facie showing that it is entitled to summary judgment. That prima facie showing can be satisfied, in cases in which the ultimate burden of persuasion at trial rests on the nonmoving party, either by submitting affirmative evidence negating an essential element of the nonmovant's claim or, by demonstrating that the nonmoving party's evidence itself is insufficient to establish an essential element of its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may make this showing either by deposing the nonmoving party's witness, by establishing the inadequacy of the documentary evidence or, if there is no evidence, by reviewing for the court what exists to show why a judgment for the nonmoving party could not be supported. *Id* Rule 56 then requires the opposing party to go beyond the pleadings to designate specific facts showing there is a genuine issue for trial. The Court must now turn to addressing each of defendants' arguments for summary judgment in light of the standards announced in the *Celotex* decision.

### IV. DEFENDANTS' ARGUMENTS

#### A. Rule 8 of the Federal Rules of Civil Procedure

Defendants initially argue that the plaintiff has failed to plead any basis for federal court jurisdiction and failed to show that she is entitled to relief, as required by Rule 8 of the Federal Rules of Civil Procedure. Rule 8 requires that a Complaint contain a short and plain statement of the grounds upon which the court's jurisdiction depends, a short and plain statement of the claim showing that the pleader is entitled to relief, and a demand for judgment for the relief the pleader seeks. FED. RULE CIV. P. 8(a). Defendants argue that nowhere in the ·Amended Complaint does the plaintiff plead any basis for jurisdiction in federal court, nor does the plaintiff make a showing that she is entitled to relief.

##### 1. Federal Court Jurisdiction

■■■ Defendants contend that plaintiff's claim should be dismissed because the Amended Complaint does not cite a jurisdictional statute. While the failure to plead jurisdiction is generally fatal to a complaint, the Eighth Circuit has recently cautioned that "subject matter jurisdiction should not be used to dismiss a case containing even a remotely plausible federal claim if the parties and the court have already made [a] vast expenditure of resources." *Pioneer Hi–Bred Intern. v. Holden Foundation Seeds, Inc.,* 35 F.3d 1226, 1242 (8th Cir.1994). Nevertheless, federal district courts are courts of limited jurisdiction. See U.S. CONST., art. III, § 1. Therefore, a federal court has a duty to assure itself that the threshold requirement of subject matter jurisdiction has been met in every case. *Bradley v. American Postal Workers Union, AFL–CIO,* 962 F.2d 800, 802 n. 3 (8th Cir.1992).

■■ A review of the plaintiff's Amended Complaint confirms the defendants' argument that the plaintiff has not made any affirmative jurisdictional statement. However, a Court may sustain jurisdiction when an examination of the entire complaint demonstrates that jurisdiction exists even though the Rule 8(a)(1) allegation is defective in some regard. *See 5* CHARLES ALAN WRIGHT & ·ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1206 (2d ed.1990). One need only briefly study the allegations of the Amended Complaint in order to ascertain that the plaintiff is asserting numerous constitutional challenges to the residency classi-

fication system of ASU. While the Court finds that plaintiff's Amended Complaint is "an inartful attempt to assert federal jurisdiction," it nevertheless finds that federal court jurisdiction is proper pursuant to 28 U.S.C. § 1331. *See, e.g., Mummelthie v. City of Mason City*, 873 F.Supp. 1293 (N.D.Iowa 1995), *aff'd without opinion*, 78 F.3d 589 (8th Cir.1996)(construing complaint as an inartful attempt to assert plausible federal claims through § 1983 violation of federal constitutional rights to due process and equal protection under the Fourteenth Amendment, or a plausible claim under the ADEA). Thus, plaintiff's cause of action will not be dismissed on the ground that she has made an inadequate showing of jurisdiction in the Amended Complaint.

### 2. Failure to State a Claim

■ Defendants also contend that plaintiff has violated Federal Rule of Civil Procedure 8(a)(2) by failing to provide a short, plain statement of the claim showing her to be entitled to relief. Defendants assert that the Amended Complaint is so deficient that they have been given "no notice" of the claims being asserted and, therefore, cannot adequately defend themselves in this matter. The Court disagrees.

■ The objective of Rule 8(a)(2) is to avoid technicalities. As stated by Justice Black in *Conley v. Gibson*, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). A defendant need only be given fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). It is the discovery process which bears the burden of filling in the details.

■ In reviewing the adequacy of the Amended Complaint, Federal Rule of Civil Procedure 8(f) requires the Court to construe the pleading "so as to do substantial justice." *Quality Mercury, Inc. v. Ford Motor Co.*,

542 F.2d 466 (8th Cir.1976), *cert. denied*, 433 U.S. 914, 97 S.Ct. 2986, 53 L.Ed.2d 1100 (1977). However, the notion of "substantial justice" must be balanced against the countervailing doctrine of "fair notice." *See, e.g., Shelter Mut. Ins. Co. v. Public Water Supply Dist. No. 7*, 747 F.2d 1195, 1198 (8th Cir. 1984).

The Amended Complaint provides a detailed factual account of the matters giving rise to the instant litigation. In addition, it sets forth by separate paragraph each and every constitutional challenge to the residency requirements of ASU. In light of the allegations made, the defendants have been given fair notice of the factual claims of the plaintiff and have been made aware of the constitutional challenges which the plaintiff asserts. The Court finds that such pleading makes a sufficient showing under Federal Rule 8(a) and gives adequate notice to the defense. Therefore, defendants' Motion for Summary Judgment as to this ground is denied.

### B. Subject Matter Jurisdiction

Defendants next argue that the Court lacks subject matter jurisdiction over this controversy because the plaintiff is seeking a writ of mandamus, which federal courts may only grant in aid of their previously-acquired jurisdiction. *See* Plaintiff's Amended Complaint, p. 5 ("Wherefore, petitioner prays that this court issue a writ of mandamus commanding defendants to refund the nonresident tuition fee of $6,928.00 plus interest, paid by petitioner; to register petitioner in Arkansas State University, as a resident of the State of Arkansas for future tuition purposes, to cease applying a citizenship requirement to the plaintiff and to any other person in the same or similar circumstance and to pay petitioners [sic] costs incurred herein, for attorney fees and for such other and further relief as the court may deem proper.").

28 U.S.C. § 1651, which is referred to as the "All Writs" Statute, states:

The Supreme Court and all courts established by act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

28 U.S.C. § 1651. Defendants argue that the courts have repeatedly held that unless the plaintiff is seeking to enforce a previous order of a federal court, a writ of mandamus in federal court is improper. *See* Brief in Support of Summary Judgment, pp. 5–6 (citing *Woods Brothers Constr. Co. v. Yankton Co.,* 21 F.2d 267 (8th Cir.1927)). Additionally, defendants contend that federal courts cannot issue a writ of mandamus to compel a state official to comply with state law. *See, e.g., Harris v. Dept. of Corrections,* 426 F.Supp. 350 (W.D.Okla.1977).

Plaintiff concedes that it would be improper for the Court to grant the requested relief by way of mandamus. However, plaintiff contends that this Court does have subject matter jurisdiction because she is seeking declaratory and injunctive relief, refund of tuition and attorney's fees. According to the plaintiff, it is the requested injunctive relief which, if granted, would prohibit the defendants from continuing to impose the current residency requirements. Thus, plaintiff argues that this Court has jurisdiction over her claims.

■ Because the plaintiff has conceded that a writ of mandamus may not issue in the present case, the Court need not further address the issue. However, the Court must consider whether it can properly construe the plaintiff's Amended Complaint as seeking injunctive and declaratory relief, as opposed to relief by way of mandamus, in light of the allegations contained in the Amended Complaint.

Clearly, the Amended Complaint requests relief by way of mandamus and makes no reference to either an injunction or declaratory judgment. However, the Court is of the opinion that it may construe the pleading as requesting injunctive and declaratory relief. For example, in *Olson v. Hart,* 965 F.2d 940 (10th Cir.1992), the Tenth Circuit construed a petition for writ of mandamus as a request for injunctive or declaratory relief under 42 U.S.C. § 1983. *Id.* at 943. The Court recognizes an obvious distinction between the *Olson* case and the facts of this case—the plaintiff in *Olson* was proceeding pro se,

while the plaintiff in the instant case is represented by counsel. *See also, Carter v. Hardy,* 526 F.2d 314, 315 (5th Cir.)(per curiam), *reh'g denied,* 528 F.2d 928 (5th Cir.), *cert. denied,* 429 U.S. 838, 97 S.Ct. 108, 50 L.Ed.2d 105 (1976)(construing a pro se petition for writ of mandamus as request for injunctive relief).

■ Even though the plaintiff is represented by counsel, the Court finds that dismissal would be a harsh remedy to impose for the procedural error and that any amendment to the pleading, which would be freely given by the Court, would be simply a matter of semantics. *See also, In re SDDS, Inc.,* 97 F.3d 1030 (8th Cir.1996)(holding that where the liberal standards for notice of appeal have been met, a petition for writ of mandamus may be construed as a notice of appeal from an immediately appealable order). Therefore, the Amended Complaint shall be construed by the Court as seeking declaratory and injunctive relief Further, as noted by the plaintiff, suits may be brought in federal court against state officials in their official capacities for prospective injunctive relief to prevent future violations of federal law. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Thus, the Court has satisfied itself that it has proper jurisdiction over this matter as the plaintiff seeks declaratory and injunctive relief for alleged constitutional violations.

### C. Mootness

■ Defendants next contend that the plaintiff's claims are now moot. Specifically, the plaintiff claims that she is entitled to be registered as a resident of the State of Arkansas for tuition purposes at Arkansas State University. However, the plaintiff now resides in Louisiana and has already been graduated from ASU.[2] Thus, the defendants argue that any injunctive or declaratory relief by the Court would issue on a "purely moot proposition of law."

■ As the United States Supreme Court has repeatedly held, a federal court may not

---

**2.** In her deposition, the plaintiff testified that she received a degree from ASU in nursing in May of 1995. *See* Deposition of Germaine Hein, p. 15.

Further, the plaintiff testified that she has lived in Monroe, Louisiana since May of 1996. *Id.* at 19.

hear a case that has become moot. *North Carolina v. Rice*, 404 U.S. 244, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971). This is because "federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them." *Id.* at 246, 92 S.Ct. at 404. The inability of the federal judiciary to review moot cases derives from the requirement of Article III of the Constitution, under which the exercise of judicial power depends upon the existence of a case or controversy. *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 394 n. 3, 11 L.Ed.2d 347 (1964).

 The question of mootness is a federal one which a federal court must resolve before it assumes jurisdiction. *North Carolina v. Rice, supra,* at 246, 92 S.Ct. at 404. Further, a real, live controversy must exist *at all stages of review,* not merely when the complaint is filed. *See, e.g., DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974)(emphasis added)(dismissing as moot a white law student's challenge to state's affirmative action program, since the student, although originally passed over for minority applicants with allegedly poorer records, had been admitted to law school while litigation was pending, was about to be graduated by the time the case reached the Supreme Court and would receive the same law degree whether or not the affirmative action program was invalidated).

The Court finds that the plaintiff's claims for injunctive and declaratory relief are now moot. The plaintiff is no longer enrolled as a student as ASU and, in fact, no longer resides in the State of Arkansas.[3] Additionally, the plaintiff has not cast her suit as a class action. *DeFunis,* 416 U.S. at 317, 94 S.Ct. at 1706. Thus, there is no real, live controversy pursuant to which the Court may award injunctive or declaratory relief *See Lister v. Lucey,* 575 F.2d 1325, 1336 (7th

Cir.1978), *cert. denied,* 439 U.S. 865, 99 S.Ct. 190, 58 L.Ed.2d 175 (1978)(holding that plaintiffs' claims for injunctive and declaratory relief for alleged unconstitutional residency classifications were moot, as plaintiffs were no longer enrolled as students at defendant university). *See also, DeFunis, supra.* However, the Court finds that the plaintiff's claim for monetary damages is not moot, as the amount requested is more than a mere "nominal" or "incidental" amount. *Lister,* 575 F.2d at 1336 (finding that $7,000 claim for allegedly over-paid tuition was not "nominal" amount). *Compare, Kerrigan v. Boucher,* 450 F.2d 487 (2d Cir.1971). Thus, the Court retains jurisdiction over plaintiff's claims for monetary damages in the amount of $6,928.00 and her claims for attorney's fees and costs.

### D. Qualified Immunity

 Defendants argue that, in the event the Court does not dismiss the plaintiff's claims in their entirety, they are nevertheless entitled to qualified immunity. Public officials are entitled to qualified immunity in the discharge of discretionary duties when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). To be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The qualified immunity defense provides ample protection to all but the plainly incompetent or those who wrongly violate the law. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

---

**3.** The plaintiff attempts to overcome the defendants' mootness argument by asserting that, in the future, she intends to pursue a graduate degree from ASU. While this may in fact be true, the Court is of the opinion that this allegation is insufficient to salvage plaintiff's declaratory and injunctive relief claims because such an allegation presents separate and distinct issues of ripeness. The plaintiff has not moved back to the State of Arkansas, nor has she applied for graduate admission to ASU. Thus, there is no

immediate threat of harm to the plaintiff. *See, e.g., Monahan v. State of Nebraska,* 687 F.2d 1164 (8th Cir.1982), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1252, 75 L.Ed.2d 481 (1983)(holding that although former student stated she planned to move back to school district and continue her education, where there was no indication if and when that eventuality would actually happen, issues raised by student about her educational placement were not ripe for adjudication).

As noted above, the Court has previously dismissed the plaintiff's monetary claims against ASU and the individual defendants in their official capacities. Now, the Court has dismissed plaintiff's claims for injunctive and declaratory relief. Thus, the only remaining issue is whether qualified immunity shields the individual defendants from monetary liability in their individual capacities. Under *Anderson, supra,* the relevant inquiry is whether, "in light of pre-existing law," the actions of the defendants are apparently unlawful. 483 U.S. at 640, 107 S.Ct. at 3039. The Court is of the opinion that the actions of the defendants were not apparently unlawful in light of pre-existing law.

Defendants contend that the Arkansas Department of Higher Education is the agency responsible for determining tuition rates for in-state and out-of-state students. Ark.Code Ann. § 6–61–215. Pursuant to this provision, the Department of Higher Education has promulgated rules defining in-state versus out-of-state students. *See* Residency Classification for Tuition Purposes, *supra.* According to these classifications:

A student should be classified as an instate resident for tuition purposes only if his or her legal residence is located in Arkansas. This means that Arkansas is the legal place of residence of the student for all purposes and that the student demonstrates by good faith acts the intent to make Arkansas his or her permanent home. Legal residence in Arkansas is required for at least six continuous months prior to the classification decision in order to be classified as a resident for tuition purposes. Mere physical presence in Arkansas is not sufficient to establish residency or demonstrate future intent.

. . . . .

To acquire a legal residence in Arkansas, an individual must have established a legal home of permanent character, resided in Arkansas for six continuous months and have no present intention of changing residence to a location outside Arkansas.

Determination of legal residence for tuition purposes shall be based on review by institutional officials of all relevant circumstances which together may reasonably demonstrate legal residence and state of mind regarding residency intent.

. . . . .

It is the responsibility of each student, at the time of registration, to seek the proper residency classification for tuition purposes. Any residency classification which is made by the institution may be appealed to the Registrar or other designated officer. This individual shall conduct hearings, receive evidence and take other appropriate steps to render a decision and provide notice of that decision to the student. Each student who raises the question of his or her residency status shall be provided written notice of the appeals procedure.

A student whose geographic origin is outside the state of Arkansas has the burden of establishing proof that he or she should be classified a resident of Arkansas for tuition purposes. Evidence must be provided in writing and verified under oath by the student. Anyone who knowingly gives erroneous information in order to evade payment of out-of-state tuition or fees shall be subject to dismissal by the college or university. Initial classification as an out-of-state resident shall not limit the right of any student to be reclassified later as a resident of Arkansas for tuition purposes, provided that the student can establish proof of legal residence in Arkansas.

In short, Arkansas residency requires a six-month continuous presence in the State, coupled with an intent to make Arkansas one's permanent home. Defendants claim that it was objectively and legally reasonable for them to conclude that the plaintiff did not qualify as a resident of the State of Arkansas because she lacked the necessary intent to become a resident. Defendants assert that plaintiff's certification for F–1 non–immigrant status precluded her, as a matter of law, from forming the requisite intent to become an Arkansas resident. For the reasons stated herein, the Court finds that the application of this "irrebuttable presumption" in the instant case did not violate the "clearly established" rights of the plaintiff. In reaching this conclusion, the Court does not hold, as a matter of law, that the plaintiff is not

entitled to in-state residency status. Rather, the question addressed is narrowly confined to issues of qualified immunity and whether any such rights of the plaintiff were "clearly established" at the time of the University's actions.

In *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), the Supreme Court declared unconstitutional a Connecticut statute which denied a student the opportunity to present evidence that he was a bona fide resident of the state and, therefore, entitled to in-state tuition rates. The Court found that the State of Connecticut had applied an irrebuttable presumption of nonresidence, when that presumption was not necessarily or universally true in fact. Under the relevant state statute, if a student was classified "out-of-state" at the time of his application for admission, the student could not change his status no matter what his actual domiciliary intent was at a later date. *Id.* at 442–43, 93 S.Ct. at 2231–32. In reaching its decision, the Court noted:

> It may be that most applicants to Connecticut's university system who apply from outside the State or within a year of living out of State have no real intention of becoming Connecticut residents and will never do so. But it is clear that not all of the applicants from out of State inevitably fall in this category.

*Id.* at 448, 93 S.Ct. at 2234. The Court rejected the state's attempts to justify its policy and went on to hold that

> since Connecticut purports to be concerned with residency in allocating the rates for tuition and fees in its university system, it is forbidden by the Due Process Clause to deny an individual the resident rates on the basis of a permanent and irrebuttable presumption of non-residence, when that presumption is not necessary true in fact, and when the State has reasonable alternative means of making the crucial determination. Rather, standards of due process require that the State allow such an individual the opportunity to present evidence showing that he is a bona-fide resident entitled to in-state rates.

*Id.* at 452, 93 S.Ct. at 2236. The Supreme Court has recognized the unconstitutionality of applying such irrebuttable presumptions in other contexts as well. *See, e.g., Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)(holding unconstitutional on due process grounds Illinois' statutory irrebuttable presumption that all unmarried fathers are unsuitable and unqualified parents); *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974)(invalidating mandatory leave and return rules for pregnant teachers in Ohio and Virginia on due process grounds because the rules established conclusive presumptions of facts that were not universally true, i.e., that all women who were four or five months pregnant or who gave birth three months or less before they sought return to work were physically incapable of performing their job duties).

Most notably, the Supreme Court has addressed the irrebuttable presumption issue in the context of non–immigrant aliens seeking in-state residency for tuition purposes. *Elkins v. Moreno,* 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614(1978).[4] *Elkins* involved a challenge to the University of Maryland's in-state tuition policy that refused to grant in-state status to non–immigrant aliens with G–4 visas on the ground that the holder of a G–4 visa was conclusively presumed to be incapable, as a matter of law, of demonstrating an essential element of domicile—the intent to live permanently or indefinitely in Maryland. The district court found for the students, finding that the University's procedures for determining in-state status violated the principles established in *Vlandis.* The Fourth Circuit affirmed. *Moreno v. University of Maryland,* 420 F.Supp. 541 (D.Md.1976), *aff'd without opinion,* 556 F.2d 573 (4th Cir. 1977). The Supreme Court held in *Elkins* that

> [b]ecause petitioner makes domicile the "paramount" policy consideration and because respondents' contention is that they can be domiciled in Maryland but are conclusively presumed to be unable to do so, this case is squarely within *Vlandis* as

---

4. The *Elkins* case was twice re-visited by the Supreme Court. *Toll v. Moreno,* 441 U.S. 458, 99 S.Ct. 2044, 60 L.Ed.2d 354 (1979)(per curiam); *Toll v. Moreno,* 458 U.S. 1, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982).

limited by *Salfi* to those situations in which a State 'purport[s] to be concerned with [domicile, but] at the same time den[ies] to one seeking to meet its test of [domicile] the opportunity to show factors clearly bearing on that issue.'

435 U.S. at 660, 98 S.Ct. at 1346 (quoting *Weinberger v. Salfi*, 422 U.S. 749, 771, 95 S.Ct. 2457, 2469–70, 45 L.Ed.2d 522 (1975)).

While at first blush the *Moreno* decision appears to squarely support the plaintiff's contentions in the instant case, *Moreno* is distinguishable on its facts. The plaintiffs in *Moreno* were G–4 aliens, as opposed to Ms. Hein, who is a F–1 alien. The difference in classifications was discussed in great detail by the Supreme Court in *Moreno*. At this juncture, it is appropriate to quote at length from the Court's discussion of the Immigration and Nationality Act. The opinion in *Moreno* stated:

> As amended in 1976 the [Immigration and Nationality] Act establishes two immigration quotas, one for the Eastern and one for the Western Hemisphere. The object of the quotas is to limit the number of aliens who can be admitted to the United States for permanent residence. To this end, the Act divides aliens into two classes. The first class, immigrant aliens, includes every alien who does not fall into an exclusion established by § 101(a)(15) of the Act, 66 Stat. 167, as amended 8 U.S.C. § 1101(a)(15) (1976 ed.). Except for immigrant aliens who are "immediate relatives of United States citizens" or "special immigrants defined in section 101(a)(27)," each alien admitted for permanent residence or who later becomes eligible for permanent residence is chargeable against a quota and no alien can be granted permanent residence status unless a quota allocation is available. However, it is important to note that there is no requirement in the Act that an immigrant alien have an intent to stay permanently in the United States. The second class of aliens, non–immigrant aliens, is established by § 101(a)(15) of the Act. This section creates 12 subcategories of aliens who may come to the United States without need for a quota allocation. See § 101(a)(15)(A)-(L). Congress defined non–immigrant classes to provide for the needs of international diplomacy, tourism, and commerce, each of which requires that aliens be admitted to the United States from time to time and all of which would be hampered if every alien entering the United States were subject to a quota and to the more strict entry conditions placed on immigrant aliens.
>
> Although non–immigrant aliens can generally be viewed as temporary visitors to the United States, the non–immigrant classification is by no means homogeneous with respect to the terms on which a non–immigrant enters the United States. For example, Congress expressly conditioned admission for some purposes on an intent not to abandon a foreign residence or, by implication, on an intent not to seek domicile in the United States. Thus, the 1952 Act defines a visitor to the United States as "an alien ... having a residence in a foreign country which he has no intention of abandoning" and who is coming to the United States for business or pleasure. § 101(a)(15)(3). Similarly, a non–immigrant student is defined as "an alien having a residence in a foreign country which he has no intention of abandoning ... and who seeks to enter the United States temporarily and solely for the purpose of pursuing ... a course of study ...." § 101(a)(15)(F). See also § 101(a)(15)(C) (aliens in "immediate and continuous transit"); § 101(a)(15)(D) (vessel crewman "who intends to land temporarily"); § 101(a)(15)(H)(temporary worker having residence in foreign country "which he has no intention of abandoning").
>
> By including restrictions on intent in the definition of some immigrant classes, Congress must have meant some aliens to be barred from these classes if their real purpose in coming to the United States was to immigrate permanently. Moreover, since a non–immigrant alien who does not maintain the conditions attached to his status can be deported, see § 241(a)(9) of the 1952 Act, 66 Stat. 206, 8 U.S.C. § 1251(a)(9)(1976 ed.), it is also clear that Congress intended that, in the absence of an adjustment of status (discussed below), non–immigrants in restricted classes who sought to establish domicile would be deported.

*Moreno,* 435 U.S. at 664–65, 98 S.Ct. at 1348–49.

The Court then went on to note that the plaintiff in *Moreno* was a G–4 non–immigrant, which is an unrestricted class of non–immigrants. In other words, Congress had placed no restrictions on G–4 aliens which would require them to maintain a foreign residence. *See Moreno,* 435 U.S. at 666, 98 S.Ct. at 1349–50. In so noting, the Court stated, "Since the 1952 Act was intended to be a comprehensive and complete code, the conclusion is inescapable that, where as with the G–4 class Congress did not impose restrictions on intent, this was deliberate." *Id.* Thus, *Moreno* simply held that the application of an irrebuttable presumption of non-residence to a G–4 visaholder violated due process. The Court specifically noted that it "... need not decide the effect of a federal law restricting non–immigrant aliens ... [such as F–1 aliens], since it is clear that Congress did not require G–4 aliens to maintain a permanent residence abroad or to pledge to leave the United States at a certain date." *Id* at 663–64, 98 S.Ct. at 1348. *See also, Toll v. Moreno,* 458 U.S. 1, 14, 102 S.Ct. 2977, 2984–85, 73 L.Ed.2d 563 (1982)(stating that "In light of Congress' explicit decision not to bar G–4 aliens from acquiring domicile, the State's decision to deny 'in-state' status to G–4 aliens, *solely* on account of the G–4 alien's federal immigration status, surely amounts to an ancillary 'burden not contemplated by Congress' in admitting these aliens to the United States.")[5]

While the Supreme Court has never addressed the issue of whether a F–1 non–immigrant is entitled to establish proof of intent to become a resident, at least one lower court has addressed this identical issue and defendants rely heavily on this case. *Seren v. Douglas,* 30 Colo.App. 110, 489 P.2d 601 (1971). In *Seren,* the Colorado Court of Appeals held that a non–immigrant F–1 student was not entitled to in-state tuition because the student could not form the requisite intent to become a resident. The court cited 8 U.S.C. § 1101(a)(15)(F)(i), which defines a non–immigrant student as one entering the United States temporarily and solely for the purpose of pursing a course of study. Because the student was a non–immigrant as defined by federal law, the court stated:

> We agree that the federal statutes in question did create a legal disability which would render Seren incapable of forming the intent required by state statute so long as he, in compliance with federal law, was here on a legal basis which bound him to not abandon his homeland.

*Seren,* 489 P.2d at 603.

In light of the fact that neither the Supreme Court nor the Eighth Circuit has directly addressed the issue presented in this case, the Court finds that the defendants did not violate the plaintiff's clearly established rights.[6] Plaintiff could have sought an ad-

**5.** The Supreme Court then certified to the Maryland Court of Appeals the issue of whether a G–4 non–immigrant alien was precluded by state law from becoming a resident of the State of Maryland. *Moreno,* 435 U.S. at 668–69, 98 S.Ct. at 1350–51. The Maryland Court of Appeals responded to the certification by stating that nothing in the laws of the State of Maryland precluded such a person from becoming a resident of the State. *Toll v. Moreno,* 284 Md. 425, 397 A.2d 1009, 1019 (1979).

**6.** The plaintiff cites numerous cases where the issue of residency of an alien has been before various tribunals. None of these cases, however, dealt with the issue of in-state tuition status. Rather, the majority of the cited authority dealt with the concept of state residency in divorce proceedings. *See, e.g., Williams v. Williams,* 328 F.Supp. 1380 (D.C.V.I.1971); *Sinha v. Sinha,* 341 Pa.Super. 440, 491 A.2d 899 (1985); *In Re Marriage of Pirouzkar,* 626 P.2d 380, 51 Or.App.

519 (1981); *Cocron v. Cocron,* 84 Misc.2d 335, 375 N.Y.S.2d 797 (1975); *Das v. Das,* 254 N.J.Super. 194, 603 A.2d 139 (1992); *Gosschalk v. Gosschalk,* 138 A.2d 774, 48 N.J.Super. 566 (1958); *Nicolas v. Nicolas,* 444 So.2d 1118 (1984); *Rzeszotarski v. Rzeszotarski,* 296 A.2d 431 (1972); *Dick v. Dick,* 18 Cal.Rptr.2d 743, 15 Cal.App.4th 144 (1993); *Bustamante v. Bustamante,* 645 P.2d 40 (Utah 1982). Others involved deportation proceedings. *Bong Youn Choy v. Barber,* 279 F.2d 642 (9th Cir.1960); *Brownell v. Gutnayer,* 212 F.2d 462 (D.C.Cir. 1954); *Brownell v. Stjepan Bozo Carija,* 254 F.2d 78 (D.C.Cir.1957). Still others arose in the context of tax refund proceedings. *See, e.g., Nagaraja v. Commissioner of Revenue,* 352 N.W.2d 373 (Minn.1984). None of the cited authority persuades the Court that the right of a F–1 non–immigrant to establish residency for purposes of tuition was "clearly established" at the time Ms. Hein sought in-state residency status.

justment of her F–1 visa status at anytime before applying for in-state tuition status. However, she chose not to do this.[7] Based on all the factors herein discussed, the Court finds in favor of the defendants on their qualified immunity arguments and denies the relief sought in the plaintiff's Amended Complaint. Therefore, it is unnecessary to reach the defendants' final argument that the plaintiff has failed to state a claim upon which relief may be granted.[8]

7. Beginning with the 1952 Act, Congress created a mechanism, "adjustment of status," through which an alien already in the United States could apply for permanent residence status. 8 U.S.C. § 1255. While the adjustment of status is a matter of grace, not right, the Board of Immigration Appeals has stated:

> Where adverse factors are present in a given application, it may be necessary for the applicant to offset these by a showing of unusual or even outstanding equities. Generally, favorable factors such as family ties, hardship, length of residence in the United States, etc., will be considered as countervailing factors meriting favorable exercise of administrative discretion. *In the absence of adverse factors, adjustment will ordinarily be granted,* still as a matter of discretion.

*Matter of Arai,* 13 I. & N. Dec. 494, 496 (1970)(emphasis added).

8. The Court notes that, even if the plaintiff had been provided a hearing on the issue of her intent to become a resident of the State of Arkansas, it appears unlikely that Ms. Hein could have met her burden of proof. The strongest evidence of intent demonstrated in the record is that the plaintiff's husband was granted permanent residency visa status in 1994. In the Court's opinion, however, this fact only goes to prove *Mr. Hein's* intent to become an *American citizen.* It does not establish any intent on his part to become a *resident of the State of Arkansas.* Moreover, it does not necessarily follow that because Mr. Hein might have the intent to become a resident of Arkansas, that his wife likewise possesses this same intent. As a related matter, the record demonstrates that Ms. Hein never sought to adjust her temporary visa status during her efforts to establish residency. Finally, while certainly of no legal significance to the issues at hand, the fact that the couple moved to Louisiana in May of 1996 suggests to the Court that the plaintiff lacked a genuine domiciliary intent at the time she sought in-state tuition status.